Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LANCE K. POULSEN and BARBARA
POULSEN,

        Plaintiff(s),

        -against –

HAROLD W. POTE, THOMAS G.
MENDELL and J.P. MORGAN CHASE
& CO.,

        Defendant(s).

05604034

**SUMMONS**

INDEX NO._____

DATE PURCHASED:_____

PLAINTIFFS DESIGNATE NEW YORK
COUNTY AS THE PLACE OF TRIAL


FILED
NOV 14 2005
NEW YORK
COUNTY CLERKS OF

TO THE ABOVE-NAMED DEFENDANTS:

    You are hereby summoned and required to serve upon plaintiffs' attorney an answer to the complaint in this action within twenty days after the service of this summons, exclusive of the day of service, or within thirty days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the complaint.

    The basis of the venue designated is as follows: Defendants Harold W. Pote and Thomas G. Mendell reside in New York County, New York. Defendant J.P. Morgan Chase & Co. has its headquarters in New York County, New York.

Dated: Garden City, New York
        November 7, 2005

                    FELLIG, FEINGOLD,
                    EDELBLUM & SCHWARTZ, LLC
                    821 Franklin Avenue, Suite 203
                    Garden City, New York 11530
                    (516) 338-1720
                    Attorney for Plaintiffs, Lance Poulsen and
                    Barbara Poulsen

By: Thomas J. Fellig, Esq.

Defendants' addresses:

1.    Harold W. Pote:
      162 East 81st Street
      New York, New York 10028

2.    Thomas G. Mendell:
      911 Park Avenue
      New York, New York 10021

3.    J.P. Morgan Chase:
      270 Park Avenue
      New York, New York 10017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LANCE POULSEN and BARBARA
POULSEN,
4551 Grassy Point Blvd.
Port Charlotte, FL 33952

     Plaintiffs,

     -against –

HAROLD W. POTE
162 E 81st St
New York, NY 10028

And

THOMAS G. MENDELL
911 Park Avenue, Apt. 12B
New York, NY 10021

And

J.P. MORGAN CHASE & CO.
270 Park Ave.
New York, NY 10017

Serve on:

The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

     Defendants.

INDEX NO.

05604034



## COMPLAINT AND DEMAND FOR JURY TRIAL

Lance Poulsen and Barbara Poulsen (hereinafter collectively referred to as "Plaintiffs" except where individual designation is made), by and through their counsel,

bring this action against Harold W. Pote ("Pote"), Thomas G. Mendell ("Mendell") and their employer, J.P. Morgan Chase & Co., and for causes of action state:

## INTRODUCTION

This is an action brought by Plaintiffs, Lance and Barbara Poulsen, a husband and wife who at various times served as top officers and directors of National Century Financial Enterprises, Inc. ("NCFE") and its subsidiaries, preeminent companies from 1991 through October 2002 in the booming business of asset-based health care receivable financing. Plaintiffs bring this action for fraud, fraudulent concealment, constructive fraud, civil conspiracy, breach of fiduciary duty, negligent misrepresentation, intentional misrepresentation, gross negligence, and negligence against Defendants Pote (who today is J.P. Morgan Chase & Co.'s Vice Chairman of Retail Financial Services), and fellow J.P. Morgan Chase executive Mendell, as well as Defendant J.P. Morgan Chase & Co. ("J.P. Morgan Chase") (sued, as the employer of the individual Defendants, for having authorized and/or ratified their misconduct). The Plaintiffs' injuries and damages are separate and distinct from any loss to NCFE and its subsidiaries, and give rise to liability of the Defendants for compensatory and punitive damages. The Defendants' conduct caused the Poulsens' compensatory damages in excess of $1 billion.

NCFE, founded in 1991 by Plaintiff, Lance Poulsen, as well as by Donald Ayers, David Moses, and Rebecca Parrett, was the largest asset-backed health care finance company in the United States. Virtually, all the major health care securitization transactions from the early 1990s on had involved NCFE and its servicing arm, National Premier Financial Services ("NPFS"). Over a period of 11 years, NCFE had successfully purchased, amortized, and paid out over $15 billion in medical accounts receivable. Over

2

350 employees of NCFE were involved in the process of providing daily funding to more than 4,000 health care clients, representing virtually every state in the nation. Even the U.S. Government, through its health care administration arm, Medicare, gave the NCFE program its blessing in a telling manner. The government allowed health care providers to sell Medicaid and Medicare receivables to NCFE exclusively though it would not permit government receivables to be sold to others in NCFE's industry.

Two of NCFE's subsidiaries were special purpose vehicles ("SPVs") known as NPF VI (of which J.P. Morgan Chase was the Trustee) and NPF XII (of which Bank One, later acquired by Chase in a $58 billion transaction, was the Trustee), to which investors had directed billions of dollars because of Plaintiffs' and NCFE's strong track record and because of the "bankruptcy-remote" status of NPF VI and NPF XII vis-à-vis one another as well as NCFE. The meaning and purpose of NPF VI and NPF XII's status as bankruptcy-remote SPVs was that any financial distress experienced by either NCFE itself or by another SPV affiliated with NCFE should have had no impact on either NPF VI or NPF XII, and likewise a bankruptcy of either one of them should not have necessitated the bankruptcy of the other. This feature was of paramount importance to investors because they therefore needed only to concern themselves with the structural soundness and future outlook of the particular SPV in which they were considering placing funds.

Ultimately, however, the Defendants, the very persons who were responsible for ensuring that these SPVs' governing rules be faithfully applied and their bankruptcy-remote features preserved, violated those rules and expectations. They simultaneously cast NPF VI, NPF XII and NCFE into unjustified bankruptcies in November 2̲0̲

believing that doing so would best serve their own personal interests and those of the individual Defendants' corporate employer, J.P. Morgan Chase, at a time at which the bank and many of its top officials were already mired in scandal. The individual Defendants were representatives of Chase, the Trustee of NPF VI, as well as Directors, and therefore had direct fiduciary obligations to the investors that they violated by ushering solvent companies into bankruptcy. But for their self-induced conflicts, those companies would still be in business today. J.P. Morgan Chase, in working for years with its high-profile business partner Enron, had helped to facilitate Enron's extensive and dishonest use of SPVs and off-balance-sheet accounting, and in 2002 the bank found itself at the center of lawsuits and investigations as a result. NCFE made appropriate use of SPVs and off-balance sheet accounting, and its financial reporting had been scrutinized and approved by independent auditors and other professionals on at least 32 separate occasions. Nevertheless, J.P. Morgan Chase's highly-publicized linkage to Enron's improper accounting raised the specter of enhanced scrutiny of NCFE's accounting for SPVs in a framework in which the bank served as Trustee for one of the key SPVs, Pote was Chairman of NCFE's Audit Committee and Pote and Mendell were Directors of NCFE entities. NCFE, its subsidiaries, and the Plaintiffs all became the victims of the Defendants' self-serving belief that they could not afford to take the additional risk of legal liability and adverse publicity if NCFE's financial reporting were misconstrued as improper and/or inaccurate. The bank had repeatedly validated the practice of transfers by and between NCFE's SPVs pursuant to the SPVs' Master Indenture Agreements, and did not want to be held responsible if such transfers were ever misperceived as illegitimate and somehow at odds with the SPVs' bankruptcy-remote

status. The Defendants also wanted no additional high-profile adverse events to prevent their ability to proceed with contemplated mergers that could steady J.P. Morgan Chase's business at a time at which it was already reeling from poor performance and takeover rumors.

In October 2002, in the midst of a power play motivated by their fears of criminal culpability under the recently enacted Sarbanes-Oxley Act and in an atmosphere of panic at J.P. Morgan Chase over the heavy scrutiny being placed on the bank for its substantial roles in the high-profile Enron and WorldCom scandals, Pote and Mendell (Directors at the time of NCFE as a consequence of J.P. Morgan Chase's minority ownership stake in that company) engineered a coup that unlawfully put them in a position of total control of NCFE, NPF VI, and NPF XII. They shortly thereafter forced each of these entities into bankruptcy, believing that those entities' bankruptcies would obscure and perhaps eliminate the Defendants' personal exposure to culpability, including potential criminal culpability, for their own misconduct at those entities. Their actions leading up to the unjustified bankruptcies constituted violations not merely of the Master Indenture Agreements that governed the NCFE, NPF VI, and NPF XII businesses, but also of the laws of Ohio, the home state for the NCFE entities.

The conflicts and concerns of J.P. Morgan Chase and its top executives, including Pote and Mendell, in 2002 were many and substantial, and spurred their misconduct in this matter. The Defendants' conflicts were a function both of the various roles they performed for a number of entities with differing objectives and priorities, and of a maelstrom of pressure (in the forms of Congressional inquiries, adverse media publicity, regulatory investigations, and private plaintiffs' litigation) on J.P. Morgan Chase in the

5

wake of the Enron and WorldCom scandals. Pote and Mendell in October 2002 had entangled themselves in a web of conflicts from which they could not extricate themselves. They were simultaneously (1) key executives of J.P. Morgan Chase and its affiliates, (2) representatives of the Trustee of NPF VI (J.P. Morgan Chase), (3) directors of each of NCFE, NPF VI, and NPF XII (the "NCFE businesses"), and (4) attempting to curry favor with the Trustee of NPF XII (Bank One, which was already in merger discussions with Chase in October 2002). In addition, Pote was the Chairman and only member of NCFE's Audit Committee. Their conflicts prevented them from providing undivided loyalty in their capacities as directors to NCFE and its subsidiaries. Instead their loyalty went first and foremost to their corporate employer, at least until that loyalty was itself compromised by their desires to avoid personal civil and/or criminal liability under Sarbanes-Oxley and other applicable laws. The Defendants sought to further their own perceived best interests at the expense of the NCFE entities, and recklessly chose what they perceived to be the path of least resistance for themselves, irrespective of their fiduciary duties to the NCFE businesses and their investors. They buried the NCFE businesses in bankruptcy before NCFE could go public (as was contemplated for NCFE in the near term) and potentially subject the Defendants to criminal and civil culpability. Public companies are subject to SEC scrutiny, and Pote and Mendell's employer, J.P. Morgan Chase, is a publicly-traded company.

J.P. Morgan Chase, like the individual Defendants, was beset with conflicting priorities and obligations in October 2002, and those conflicts caused it to fail to perform its role as Trustee of NPF VI in a manner consistent with its fiduciary obligations. Chase was a high-profile, multi-billion dollar financial institution with extensive ties to Enron

and its auditor, Arthur Andersen. The bank (the subject of rumors in October 2002 that it was ripe for takeover by companies like Bank One, which J.P. Morgan Chase instead ultimately acquired in 2004) had played a key role in the Enron scandal as a financial institution that loaned Enron $8.6 billion and helped it structure now legendary "financial engineering" transactions such as the infamous series of Mahonia transactions. The Mahonia deals involved SPVs used in elaborate structures, created and participated in by J.P. Morgan Chase, to obscure Enron's debts and create a false picture of solvency, cash flow and earnings. The bank allowed Enron, through these and other transactions, to disguise J.P. Morgan Chase loans as supposed non-debt "income," and the SPVs were the subjects of off-balance-sheet accounting by Enron that triggered the demise of the venerable Big Five accounting firm Arthur Andersen. J.P. Morgan Chase feared that it would be the next to suffer Andersen's fate of criminal conviction and demise. With the date of passage of Sarbanes-Oxley looming, J.P. Morgan Chase and its executives knew that the stakes for misconduct were substantially on the rise. Sarbanes-Oxley – legislation motivated in part by the bank's own misconduct in the Enron and WorldCom scandals – provided for criminal and civil penalties for noncompliance with financial reporting and corporate governance requirements, called for certification of internal auditing by external auditors, and increased disclosure requirements regarding all types of financial statements. Because J.P. Morgan Chase was also contemplating major mergers and/or acquisitions, there was yet another factor in play at J.P. Morgan Chase (which had $759 billion in assets to protect as of year-end 2002) that caused it to be extraordinarily risk-averse and fearful of additional negative publicity in 2002. For the individual Defendants, the passage of Sarbanes-Oxley had an even more momentous impact:

ultimately, it caused their loyalty to J.P. Morgan Chase, which had always been paramount in their minds, to become secondary to their desire to avoid personal criminal culpability for any misconduct by the NCFE entities should they ever become public companies, as they were intent on becoming in 2002. They wanted to avoid the added layer of regulatory scrutiny that would result from NCFE becoming a public company.

NPF VI and NPF XII were always operated properly pursuant to the standards articulated in the Master Indenture Agreements that governed each SPV. Both J.P. Morgan Chase (as Trustee of NPF VI) and Bank One (NPF XII's Trustee) had, as recently as September 13, 2002, acknowledged in writing to NCFE their approval of the business practices and procedures of NCFE and its SPVs. They had provided similar authorization and consent, either verbally or in writing, on many prior occasions as well. Moreover, because it was annually audited, had been the object of previous purchase offers by other businesses, and was a private company with imminent plans of going public, NCFE's business generally (and its strong financial performance specifically) had been scrutinized on at least 32 separate occasions by independent auditors, ratings agencies, prospective buyers, brokers, underwriters, and/or attorneys – and validated on each such occasion. No material problems were discovered at any point in this period, and NCFE was given unqualified audits (i.e., audits certifying the accuracy of its financial statements without reservation or qualification) every year. This was because NCFE and its subsidiaries had been structured, in their governing indenture agreements, with layer upon layer of internal controls that included effective anti-fraud mechanisms. Among these controls were two vital aspects of the NCFE-related businesses and the governing indenture agreement for each such business. First, as noted previously, NPF

8

VI and NPF XII were set up to be bankruptcy-remote. Indeed, assurances, authorized by Chase and Bank One, as Trustees of NPF VI and NPF XII, respectively, had consistently been promulgated to investors regarding the entities' bankruptcy-remote status as an inducement to invest.

Second, each of the governing indenture agreements (there was one for each SPV) mandated that "[a]t least one of the directors of the Company [either NPF VI or NPF XII, depending on which entity's indenture agreement it was] shall be an **independent director** who shall at no time be a shareholder, *director*, officer, employee, Affiliate or associate of any shareholder of the Company." Because NCFE was a shareholder of NPF VI and NPF XII, this meant that at least one director of each of NPF VI and NPF XII had to be unaffiliated with NCFE (as well as all other shareholders of the particular SPV) at all times. This rule was established as an additional safeguard meant to reinforce the independent, bankruptcy-remote status of NPF VI and NPF XII, such that, for example, there could not be a situation in which a board composed solely of persons with official ties to NCFE could exert undue influence on NPF VI or NPF XII by forcing those entities into bankruptcy. Filing for voluntary bankruptcy required unanimity of the directors under the governing indenture agreements, and the presence at all times of a truly independent director in order to make the process of reaching unanimity more difficult (and less susceptible to abuse). A truly independent director, it was reasonably believed by the investors and auditors, would never allow a solvent, bankruptcy-remote entity to be thrust into bankruptcy. These safeguards had contributed to remarkable success at NCFE, NPF VI and NPF XII.

Remarkably, despite all of this success, all of this independent validation, and all of this structural integrity, NCFE and its subsidiaries NPF VI and NPF XII were unnecessarily and improperly plunged into bankruptcy in November 2002. Already extremely wary of linkage of their corporate employer to yet another accounting or financial reporting scandal, Pote and Mendell greatly overreacted to the fact that NCFE's auditor, Deloitte & Touche, had given relatively innocuous indications that it would need to scrutinize NCFE's books and records particularly carefully in 2002. Deloitte & Touche's caution was simply a product of the fact that NCFE's business had long made open use of SPVs and accounted for the business activities of those SPVs off-balance-sheet as a function of, among other things, their bankruptcy-remote status. NCFE's financial reporting was appropriate and subject to robust internal controls, but, in the wake of the Enron fiasco (a well-publicized example of abuse of SPVs and off-balance-sheet accounting), Deloitte & Touche needed to proceed particularly carefully with its audit of NCFE – particularly given the fact the J.P. Morgan Chase and key bank operatives such as Pote and Mendell had such prominent oversight roles with the NCFE businesses, and J.P. Morgan Chase was under heavy scrutiny for its facilitation of Enron's fraudulent financial reporting at the time. Although Deloitte & Touche was ultimately prepared to issue yet another positive audit of NCFE as the relevant paper trail indicates, by that time the Defendants had already determined that they would not allow the audit to proceed to completion. Through the pernicious influence of Pote in his capacity as Chairman of the Audit Committee, no audit of NCFE's 2001 financial statements was ever released in 2002. The absence of an issued audit by Deloitte & Touche was, as the Defendants had intended, a severe blow to NCFE's plans to go public

in 2002. The lack of an audit, which would have removed the final hurdle to an IPO, also effectively prohibited NCFE from attracting additional funding for securitizations of medical accounts receivable.

The Defendants were not through with their scheme to insulate themselves from criminal culpability and additional adverse publicity, however. Having taken additional steps in the summer and fall of 2002 (set forth in detail subsequently in this Complaint) that were injurious to the NCFE entities, they saw their plan come to fruition when they unexpectedly became the beneficiaries of a fortuitous development: the resignations of two independent directors from the SPVs' Boards of Directors in October 2002. These resignations suddenly afforded them a golden opportunity to wrest control of NPF VI and NPF XII, and Pote and Mendell pounced, notwithstanding the fact that they did not meet the respective Master Indenture Agreements' definition for the "independent" directors that they now purported to be. They were also far from independent because of their overriding concerns on behalf of Chase about a possible merger with Bank One and because they were so intent on avoiding the additional scrutiny that would come to them and the bank if any of the NCFE entities ever succeeded in going public. Acting to impede the NCFE businesses, the Defendants procured Mr. Poulsen's resignation with a false promise that they would recruit independent directors and undertake all necessary acts to ensure that NCFE would remain viable. Fully entrenched as ostensibly "independent" directors and with no other director remaining to curb their abuses, they exploited their position by doing what could not have been done had a truly independent director been in place at NPF VI and NPF XII, given that extraordinary steps like filing for bankruptcy required unanimous consent of all directors. They thrust into bankruptcy

11

the three NCFE entities that they were duty-bound to protect and seek to bolster. They did so, moreover, (1) despite the fact that those entities' assets exceeded liabilities at the time of their "bankruptcies," and (2) despite having issued a press release on November 8, 2002 (the date on which they falsely induced Poulsen to resign, and mere days before the bankruptcies) in which they asserted to investors that the NCFE entities were reorganizing, and that funding for NCFE securitizations would resume shortly. The press release said nothing derogatory about Mr. Poulsen or any other member of NCFE management, and nothing negative or pessimistic about the NCFE businesses going forward.

Having forced the NCFE entities into bankruptcy, the Defendants then compounded the damage by ensuring that the putative "turnaround specialist" that they had hired, Alvarez & Marsal, did *not* collect the receivables and other assets that could have ensured the NCFE businesses' re-emergence from bankruptcy. Finally, having ousted Lance Poulsen from control of the NCFE businesses, they undertook to besmirch his reputation and character, wrongly contending that the bankruptcies had resulted from misconduct on his part. Yet, despite the initial media reports and numerous investigative inquiries into NCFE's business affairs focused on Poulsen, he has never been charged with any criminal misconduct or civilly penalized by any governmental or regulatory body, nor has he ever been sued by the Defendants.

The Defendants had until August 2005 avoided penalty for their misconduct, but in that month the Securities and Exchange Commission (SEC) announced that it is actively investigating J.P. Morgan Chase (as well as Bank One, now a subsidiary of J.P. Morgan Chase) and two unnamed bank employees for misconduct in connection with

their misgovernance of NCFE, NPF VI and NPF XII. The Defendants now also face this lawsuit, which exposes the Defendants' fraud and forsaking of their substantial fiduciary duties in burying viable companies that they were charged with protecting.

As a result of the failed promises and misrepresentations of the individual Defendants, each acting within the scope of the authority given him by Defendant J.P. Morgan Chase, the Poulsens lost the enormous value of their expected Preferred Stock in an IPO. They also lost their original investment plus vast sums in additional investments.

## PARTIES, JURISDICTION & VENUE

1.      Plaintiff, Lance K. Poulsen, a founder of NCFE, at various times served as President, Chief Executive Officer, and a Director of NCFE. He was a shareholder of NCFE, and is a resident of Port Charlotte, Florida.

2.      Plaintiff, Barbara Poulsen, at various times served as an officer and Director of NCFE. She was a shareholder of NCFE, and is a resident of Port Charlotte, Florida.

3.      Defendant, Harold W. Pote, is a resident of New York. At all material times, Pote served as a member of the Board of Directors of NPF VI and XII, as well as a Director of NCFE, and was head of NCFE's Audit Committee. At the same time, Pote was an employee and/or officer of J.P. Morgan, and/or one or more of its affiliates, J.P. Morgan Chase Bank, J.P. Morgan Partners, LLC, The Beacon Group, LLC, and the Beacon Group III-Focus Value Fund, L.P. Mr. Pote is presently Vice Chairman of Retail Finance for J.P. Morgan Chase Bank, a bank that now includes Bank One. At all relevant times, Pote engaged in business in the State of New York and lived in New York. Pote's actions in this case occurred, *inter alia*, at his offices in New York via telephone, in-

person meetings, or e-mail. As to NPF VI all of the funds were held in trust at J.P. Morgan Chase Bank in New York.

4.    Defendant, Thomas G. Mendell, is a resident of New York. At all material times, Mendell served as a member of the Board of Directors of NPF VI and XII and as an Officer and Director of NCFE. At the same time, Mendell was an employee and/or officer of J.P. Morgan, and/or one or more of its affiliates, J.P. Morgan Chase Bank, J.P. Morgan Partners, LLC, The Beacon Group, LLC, and the Beacon Group III-Focus Value Fund, L.P. Mendell is presently a Vice President of J.P. Morgan Bank, a bank that now includes Bank One. At all relevant times, Mendell engaged in business in the State of New York and lived in New York. Mendell's actions in this case occurred, *inter alia*, at his offices in New York via telephone, in-person meetings, or email.

5.    Defendant, J.P. Morgan Chase & Co., is a Delaware corporation in the financial services business, doing business and maintaining its corporate headquarters in New York. J.P. Morgan Chase was the trustee of NPF VI. At all relevant times, J.P. Morgan Chase employed Pote and Mendell, who also acted as representatives of the company on the boards of NCFE and its subsidiaries. At all relevant times, Pote and Mendell acted within the scope of their employment and with the authority and authorization of J.P. Morgan Chase.

6.    Jurisdiction in this matter is proper pursuant to NY CPLR § 302.

7.    Venue is proper pursuant to NY CPLR § 503 because the individual Defendants reside in this County, and the corporate Defendant conducts business and maintains its corporate headquarters in this County.

## FACTS COMMON TO ALL COUNTS

### The Parent Corporation – NCFE.

8.      NCFE, an Ohio corporation, was founded in 1991 by Lance Poulsen, Donald Ayers, David Moses, and Rebecca Parrett.  Until it was unnecessarily put into bankruptcy on November 18, 2002, by the fraudulent actions of the Defendants, NCFE was the largest asset-backed health care finance company in the United States.  NCFE was originally conceived in the late 1980s as an answer to cash-strapped medical providers who were not receiving reimbursement from third party payers on a timely basis.  While large facilities such as major urban hospitals could obtain bank financing as a consequence of high credit ratings and community support, other health care providers (such as smaller rural facilities, inner city facilities or group medical providers) tended not to have the wherewithal to obtain such financing.  This gave rise to the demand for the service that NCFE provided.  NCFE eliminated the need for these smaller health care providers to devote enormous resources to collection of their accounts receivable, and allowed them to concentrate on providing quality health care.

9.      Several factoring companies offered a service similar to NCFE at the time of its founding.  Among them were Heller Financial Services of Chicago and Tower Financial Services of New York.  In contrast to NCFE, however, the existing companies operated as "sharks," taking for themselves sizeable portions of the net receivables, often as much as 15% to 20%, as compensation for the risk associated with collecting these medical receivables.  These companies, therefore, did not provide a satisfactory economic option for the medical community.  NCFE, by contrast, securitized the accounts receivable to lower cost capital.  The savings that NCFE was able to obtain were passed directly on to the health care providers.  In fact, NCFE was frequently able to provide the

15

same services as its higher-cost competitors at an ultimate cost to the health care providers of no more than 7% or 8%. As a result, NCFE ultimately established the benchmark discount rate for the entire receivables industry at the time. Virtually, all the major health care securitization transactions from the early 1990s on involved NCFE and its servicing arm, National Premier Financial Services ("NPFS").

10.     By packaging for investors large pools of health care accounts receivable and demonstrating the strong economic performance that it could deliver, NCFE was able to impress upon the largest rating agencies that its method and methodology were viable alternatives for health care providers. Even the U.S. Government, through its health care administration arm, Medicare, gave the NCFE program its blessing in a telling manner. The government allowed health care providers to sell Medicaid and Medicare receivables to NCFE though it would not permit government receivables to be sold to others in NCFE's industry.

11.     Beyond providing a critical source of funding, the company also supplied additional administrative support services to smaller health care providers, including operational management consulting services and other financing alternatives. From its inception to its demise, a period of 11 years, NCFE successfully purchased, amortized, and paid out over $15 billion in medical accounts receivable. Over 350 employees of NCFE were involved in the process of providing daily funding to more than 4,000 health care clients, representing virtually every state in the nation. NCFE's business, including the business of its subsidiaries, was growing at a rate of more than 28% per year. Daily collections into the receivables "lockboxes" maintained for the benefit of these clients were accumulating at the rate of approximately $3 billion per year, or about $1 million

per hour. NCFE was the most profitable of health care lending businesses; its profits per sale exceeded even those of longtime stalwart companies such as General Electric. By packaging for investors large pools of health care accounts receivable, and demonstrating the strong economic performance that it could deliver, NCFE was able to impress upon the largest rating agencies that its methodology was a viable alternative for health care providers. During its existence, NCFE provided accounts receivable financing to a wide variety of small and middle market health care providers who, without the assistance of NCFE, would not have had access to commercial bank financing. NCFE's customers included hospitals, nursing homes, home health care agencies, specialty clinics, physician groups, durable medical equipment providers, laboratories, and other businesses and professionals providing health care services (collectively referred to as "health care providers"). The programs grew and prospered with NCFE, and markets that were traditionally underserved by the major financial institutions like J.P. Morgan Chase were able to circumvent resulting hardships by using the NCFE system.

12. NCFE maintained the largest privately-held database in the United States related to medical receivables. In fact, because NCFE's database was so large and accurate, NCFE served as a FBI resource for purposes of data review. In addition, because it was annually audited, had been the object of previous purchase offers by other businesses, and was a private company with imminent plans of going public, NCFE's business generally (and its strong financial performance specifically) had been scrutinized time and time again by independent auditors, ratings agencies, prospective buyers, brokers, underwriters, and attorneys – and validated on each such occasion. Had there been problems with the manner in which NCFE and its subsidiaries were

conducting their business operations, those problems would have been detected by someone among the at least 32 different extremely experienced and reputable organizations reviewing those operations. Those tasked with performing key review and oversight functions included the Defendants themselves, each of whom had sterling credentials and ample experience with the management and supervisory review of public and private companies. No material problems were discovered at any point in this period. This was because NCFE and its subsidiaries had been structured, in their governing indenture agreements, with layer upon layer of internal controls that included effective anti-fraud mechanisms.

13.    NCFE raised capital for its purchases of medical accounts receivable through a process known as securitization. Securitization funds assets or transfers risk by issuing notes to the capital markets. Among the purposes of securitization are to fund acquisitions, liquidate assets, provide funding sufficient to address potential liabilities, transfer risk, and redeploy capital. To protect investors, and increase investor confidence, assets are segregated in bankruptcy remote SPVs. Thus, if NCFE or one of its affiliates entered bankruptcy, the assets of the SPVs were set up to be immune from consolidation with the bankrupt entity.

14.    Similar types of securitizations are used for credit card receivables, and are familiar to all major financial institutions. The trustees, J.P. Morgan Chase (NPF VI) and Bank One (NPF VII), of each of NCFE's SPVs used such securitizations in their own businesses, and were knowledgeable regarding the manner in which they are supposed to operate, as were the individual Defendants, Pote and Mendell.

### The NCFE Subsidiaries – NPF VI, NPF XII and National Premier Financial Services.

18

15.    NCFE's SPVs, NPF VI and NPF XII were both Ohio corporations. NPF VI and NPF XII were formed for the purpose of purchasing high quality accounts receivables at a discount from health care providers. Capital for purchasing the receivables was raised through a series of issuances of Health care Receivables Securitization Program Notes ("Notes"), which were primarily private placement sales of bonds to qualified institutional investors. All of the outstanding bonds were issued by NPF VI and NPF XII, corporations that were designed to be "bankruptcy remote." Thus, if NCFE or any of its affiliates entered bankruptcy, the assets of NPF VI and NPF XII would not be consolidated with the assets of any such entity in bankruptcy, and would not be part of the bankruptcy estate.

16.    National Premier Financial Services, Inc. ("NPFS"), another Ohio corporation, wholly owned by NCFE, monitored the receivables and worked with providers to obtain collection on them from insurance companies and government agencies.

17.    Simply put, NCFE used its bankruptcy remote subsidiaries to raise capital. Using those funds, NCFE purchased medical receivables from various licensed health care providers, for cash, at a discounted rate. The servicing arm of the corporation, NPFS, made sure of the collection from the debtor insurers, including Medicare and Medicaid. Once payment was made to the applicable NPF entity's Trustee, funds were disbursed by the Trustee to that NPF entity's bondholders and various reserve funds, and NCFE retained a service fee. Perhaps most impressive, the health care providers did not receive a portion of the recovery of their accounts receivable; NCFE returned 100% of the recovered accounts receivables to the health care providers.

19

**Investor Protection.**

18.    In order to inspire additional confidence in potential investors, NCFE,

through the Poulsens, established many safeguards to ensure independent corporate

governance and fiscal responsibility within the corporations.

19.    Bank One acted as an indenture trustee of NPF XII, which had a $2 billion

asset-backed portfolio.  J.P. Morgan Chase was the trustee for NPF VI, a $1 billion asset-

backed portfolio.  As such, J.P. Morgan Chase and Bank One were fiduciaries on behalf

of the Noteholders.

20.    NPF VI and NPF XII were each required to have three directors, and at

least one independent director that was not a shareholder, officer, employee, or affiliate

of NCFE.  This "Independent Director" provision was essential to investor relations,

providing an additional level of assurance of propriety and independence based upon the

expectation that a truly "Independent" Director would not be swayed by types of personal

concerns that Pote and Mendell actually had in the fall of 2002.  In addition, any

significant corporate action, beyond what the formation and operating documents of NPF

VI and NPF XII expressly called for, required unanimous consent by the Board of

Directors.

21.    Medical receivables of the nature that NPF VI and NPF XII collected were

unlike traditional receivables in that they were subject to annual variations in Medicare

and Medicaid laws that could change the standards for accounting and issuance of

accounts receivable.  Accordingly, the series of Indentures under which the Notes were

issued was designed to allow for maximum flexibility.  Nevertheless, there were at least

five documents that governed any significant transaction: (1) the Indenture and any

conventions agreed to by the Trustee; (2) the Sale & Subservicing Agreements and associated UCC filings; (3) rating agency criteria; (4) the Trend Analysis, and (5) the lockbox agreements. All five of these elements operated together to shape almost every major transaction envisioned in the Indenture and set the parameters for the successful operations of securitizations such as NPF VI and NPF XII.

22.    The practical impact of these various sources of governing documents was that, in order to be a party to a transaction with NCFE or its subsidiaries, the health care provider had to overcome a variety of hurdles. First, NCFE had to determine that a prospective seller of medical accounts receivable was eligible as defined by the Sale & Subservicing Agreement, Article I, Section 1.1 and 1.2. Once an eligible seller was identified, it was subject to a Trend Analysis dictated by the rating agency. The Trend Analysis was performed by a team of health care experts, consisting of an auditor with financial training, a medical accounts receivable person, and sometimes a specialist in the discipline involved (*i.e.*, hospitals or nursing homes). This trend team would be approved by the rating agency, and dispatched to a prospective buyer to conduct an in-field audit of the receivables to be sold in the program. The results of these audits were recorded in a Trend Analysis Book and made available to the rating agencies. Each one of the sellers in NPF VI and NPF XII had such an analysis performed. Even repeat sellers had additional field follow-ups and audits much of the time. All of these trend analysis portfolios were reviewed by the rating agency and approved before a seller became authorized. The list of Authorized Sellers was memorialized, and attached to the Indentures of both NPF VI and NPF XII. Both NPF VI and NPF XII were authorized sellers included in the Indentures.

23.    Once the seller was approved by the rating agency, NCFE could purchase the receivables. Deducted from the net receivable were 8.5% for reserves, 8.5% for servicing, and 3% for the offset discount, rendering the net purchase price eighty cents on the dollar. Routinely, receivables were purchased from NCFE by either NPF VI or NPF XII. Such purchases were recorded on a monthly basis in the general ledger as required by the Indenture agreements. Purchases and transfers that were made during the course of the month were accounted for on a monthly basis and the portfolios were accurately recorded as to their net value in these statements.

24.    The sale and purchase of medical accounts receivables between the portfolios was permitted under the governing documents and agreements. Individual sellers could transfer receivables between portfolios as well. This was frequently done at month's end in order to meet various concentration tests at the determination date (the one and only date where concentration limits were measured). The agreements specifically permitted the NPF portfolios to sell between each other as long as the terms and conditions of the portfolio were similar. In other words, NPF VI and XII could buy and sell receivables of one another to meet concentration limits and reserve tests. Where these transfers occurred, they were approved by the buyer's trustee and permitted by the Master Indenture and an addendum letter from the trustees of NPF VI and XII. As a further safeguard, the portfolios, including NPF VI and XII, were examined side by side once a year to ensure that they were accurate in their totality, including matching of cash.

25.    NCFE set up independently administered "lock boxes" for NPF VI and NPF XII. These lock boxes were administered by third-party banks, Huntington and Wachovia, as approved by various ratings agencies. The third-party banks were

22

responsible for actually processing the funds since neither NCFE nor its officers and directors had direct access, at any time, to the proceeds of the accounts receivable. All monies were in a closed loop and passed from the hands of the lock box banks directly to the trustee. Insurance companies and government payors made payments to NPFE's lock boxes, and the lock boxes distributed collection proceeds to health care providers, investors and NCFE pursuant to a "waterfall" agreement. In other words, NCFE would be last in line and would take its service fee only after payments to the health care providers and bondholders. The rating agencies specifically insisted on this arrangement for the protection of the bondholders and the health care clients. During NCFE's early stages, all of the monies and proceeds from the investor notes flowed into the trustee accounts and flowed out only for the purchase of accounts receivable, verified by the rating agencies, from health care providers across the country.

26. At all times, from its inception to its untimely demise in 2002, NCFE operated using generally accepted accounting principles. At all times, NCFE's annual financial statements were reviewed and unqualified opinions issued by outside Certified Public Accountant firms. NCFE received unqualified opinions in every audit year. The financial statements were prepared, without exception, in accordance with generally accepted accounting principles. In the early years, 1991-1994, the audited financial statements were done by Frank Kern & Associates, a medium-sized regional accounting firm located in Columbus, Ohio. For the 1995 audit year, at the request (but not insistence) of the rating agencies, NCFE engaged a nationally recognized auditing firm, Coopers & Lybrand. Coopers & Lybrand completed four audits for NCFE.

27.     In 2000, Price Waterhouse Coopers ("Price Waterhouse"), the successor of Coopers & Lybrand, delivered NCFE an engagement letter for the 1999 audit that included a potential conflict of interest disclosure regarding pending litigation between Price Waterhouse and one of NCFE's larger finance clients. Price Waterhouse could not guarantee completion of the audit if the litigation continued. The Audit Committee was forced to decide whether to engage Price Waterhouse, and risk not receiving a completed audit, or search for a new auditing firm. NCFE decided to search for another national accounting firm, and solicited bids from three: Ernst & Young; Deloitte & Touche, and Arthur Andersen. After their own due diligence, all three firms submitted engagement proposals to the Audit Committee. The Audit Committee selected Deloitte & Touche as the candidate for NCFE's new auditor, and retained Price Waterhouse for income tax reporting. The selection process was monitored and managed by Hal Pote who was an outside Director, and the sole member and Chairman of NCFE's Audit Committee from 1998 until 2002. The Board of Directors, at Pote's recommendation, approved the Audit Committee's selection, and formally engaged Deloitte & Touche to provide the audit for the year ended December 31, 1999. This audit was completed without material issues being raised, and Deloitte & Touche issued an unqualified opinion that the financial statements at NCFE were prepared in accordance with generally accepted accounting principles. Deloitte & Touche was engaged for 2000 and again completed the audit and issued an unqualified opinion for that year as well.

## NCFE's Prosperity and Traditional Accounting Excellence.

28.     For the 2001 audit year, NCFE once again engaged Deloitte & Touche for their annual audit. This audit represented the third year of engagement with Deloitte &

24

Touche. The engagement letter from Deloitte & Touche in this third year of audit was similar in content and contained no material changes from its previous two engagement letters.

29.     Pote was the Chairman of the NCFE Audit Committee and had total and complete control of the relationship with NCFE's auditor, Deloitte & Touche. At no time did Pote notify the NCFE Board that auditors had any concern regarding the company's accounting practices. Indeed, the auditors, in separate representations to the Board, indicated that they had found no major issues but were simply bound to proceed cautiously with the financial statement presentation of the securitizations as a result of the Enron scandal.

30.     NCFE's business model remained the same as previous years in which Deloitte & Touche had rendered their opinions. In fact, at no time during its 12 years of existence had NCFE in any way changed its business model. NCFE did not consider the securitizations to be on balance sheet other than for presentation purposes. By contract and Indenture, the assets of NPF VI and NPF XII were not able to be consolidated under NCFE's assets, yet NCFE historically purchased any defaulted or rejected receivables from these portfolios. Therefore, for presentation purposes, the balance sheet of NCFE reflected the outstanding assets of these portfolios and their liabilities without respect to an audit of either of these two portfolios.

31.     For tax and income purposes, NCFE considered servicing fees on transactions only in the year in which they occurred. It was common practice in the industry to consider the servicing fees on a pro forma basis for all the years of the securitization. NCFE took a conservative approach and recognized only the servicing

fees in the year in which they were earned. Neither NCFE nor any of its audited subsidiaries were ever insolvent. By definition, NCFE was a viable firm in every respect. NPF VI and NPF XII filed separate tax returns and were not consolidated under the tax filings for NCFE. Only servicing income was recognized. The financial statements of NCFE were conservatively presented and reflected a public company standard even though NCFE was a privately-held firm and was not required to follow public company standards.

32.    From its inception, NCFE purchased and serviced billions of dollars of health care receivables. From 1996-2001, NCFE's total revenues increased at a compounded annual rate of 36%, from $66.3 million in 1996 to $306.6 million in 2001. NCFE's net income for the year ended December 31, 2001 was approximately $41.6 million and represented a 53% compounded annual growth rate since 1996. By the middle of calendar year 2002, NCFE had a portfolio of approximately $3.3 billion in owned receivables and more than 2,100 active client locations. Thus, NCFE was the market leader in providing receivable purchase financing to small and middle market health care providers. Ultimately, prior to its demise, the run rate of NCFE was in excess of $375 million in revenue and continued the unabated trend for increases at a rate in excess of 35%.

### Original and Growing Conflicts

33.    The relationship between J.P. Morgan Chase, Bank One and NCFE began early in NCFE's existence. Joe Giordano and John Rothrock were employed by Bankers Trust, and acted as trust officers for the NPF programs for a period in the mid 1990s. Rothrock served as the day-to-day administrator of the NPF programs beginning March

1993 to July 1994 when he joined Bank One. Giordano administered the programs until late 1996 when he joined J.P. Morgan Chase. Even after their departure from Banker's Trust, Giordano and Rothrock remained in constant contact with NCFE.

34.    The entity that had employed Pote in 1998, The Beacon Group LLC, and its affiliated entities (all of which were purchased in 2000 by Defendant J.P. Morgan), invested in NCFE in that year in contemplation of a future profitable NCFE public offering, which those involved predicted would yield upwards of $1 billion. Specifically, on July 31, 1998, The Beacon Group LLC purchased approximately 20% of NCFE's stock. At all relevant times thereafter, the Beacon Group-related entities exercised substantial operational and decision-making authority over the operations of NCFE and its subsidiaries. As a result of their purchase of substantial NCFE stock, the Beacon Group entities gained control over: (1) two out of three positions on NPF VI and NPF XII's Board of Directors; (2) two out of six positions on NCFE's Board of Directors; (3) two of three positions on NCFE's special "Going Public Committee" of the Board; and (4) the NCFE Audit Committee Chairmanship, which was assumed by Pote.

35.    It was not until 2000, however, the year in which the Beacon entities were acquired by J.P. Morgan Chase, the Trustee of NPF VI, that the NCFE businesses became at least potentially vulnerable to falling victim to the bank's overarching desire to satisfy its own perceived needs and priorities first, should those priorities ever come into conflict with the objectives of NCFE and its subsidiaries. Yet controls appeared to be solidly in place to prevent the bank's self-interested prerogatives from overwhelming NCFE's best interests and the fiduciary duties owed to investors in NCFE and its SPV affiliates, including the "bankruptcy remote" nature of NPF VI and XII.

36.    Thereafter, Pote became Executive Vice President and head of Regional Banking at J.P. Morgan Chase Bank, a subsidiary of J.P. Morgan. Thomas Mendell was a Managing Director of J.P. Morgan Partners, LLC, a subsidiary of J.P. Morgan. J.P. Morgan Chase demanded that their two employees be on the NCFE board to control their interests.    Because J.P. Morgan Chase was already the trustee of the NPF VI securitization with $1 billion in assets, the stage was set for a potentially disastrous conflict of interest.

37.    Bank One was the trustee of the NPF XII securitization with $2 billion in assets.    Unbeknownst to the Plaintiffs, Bank One and J.P. Morgan Chase were contemplating a merger, and sought to avoid any adverse developments that would have prevented such a union.  Pote and Mendell sought to insulate their employer from any such developments.

**Preparation for Public Offering:**

38.    Throughout NCFE's existence, going public or selling to a large financial institution were exit strategy options for the shareholders because the corporation was a closely held, private corporation. To facilitate the process of going public, NCFE had retained nationally recognized accounting firms for its audits between 1995 and 2001.

39.    Credit Suisse First Boston ("CFSB" or "Credit Suisse") was retained as an investment banker for NCFE in order to comply with the due diligence requirements of any public (or private) offering.

40.    Over NCFE's history, there had been multiple attempts to purchase the firm by other nationally known financial organizations.    In this regard, the first significant offers came from General Electric in the mid 1990's. These firm offers for

hundreds of millions of dollars were entertained only after GE had done extensive due diligence with its nationally known auditing firms and attorneys.

41.     After receiving a complete bill of good health from General Electric, NCFE entered final negotiations over price and terms with General Electric Corporation, but the NCFE Board unanimously rejected GE's offer and decided to hold out for better terms and conditions.

42.     Throughout its existence, NCFE consistently maintained investment grade ratings for the NPF notes from Fitch Ratings and Moody's Investor Services primarily because of the methodology and mechanisms designed to protect the receivable collateral, and its strong operating history and performance.

43.     In 2002, as part of its plan for a public offering, plans were made to issue, in a private offering, Series B Convertible Preferred Stock ("Preferred Stock") at a price of $12,822 per share.  The plan called for the Preferred Stock to be convertible into NCFE common stock on a one-for-one basis in addition to board observation and registration rights. The Plaintiffs desired to, and would have purchased substantial shares of the Preferred Stock and their existing shares would have been converted to preferred shares at a substantial monetary gain.

44.     NCFE engaged the services of Kaye Scholer, a prominent New York law firm recommended by Credit Suisse, to take the company public and prepare its S-1 filing.  The lead attorney for Kaye Scholer had extensive access and conversations with NCFE personnel, documents and most importantly, its auditors, later testifying that he had "unfettered access to the company and its documents as did its accountants." Copies of the S-1 were scrutinized by numerous members of NCFE, its attorneys, Credit Suisse

29

and its attorneys, and independent counsel Kaye Scholer. In addition, the attorneys and accountants for Price Waterhouse conducted in-depth reviews of the company and its reporting requirements under existing generally accepted accounting principles. The company continued forward with the issuance of an S-1 draft which was circulated to over 40 individuals, investors, auditors, board members and management personnel of NCFE for review and comment. The business model, its business practices, audits, reviews, status of books, Indentures and compliance were thus carefully scrutinized.

45.    The extensive scrutiny of the company revealed several issues that needed to be addressed prior to filing the S-1 with Securities & Exchange Commission, and these were addressed successfully. The first issue was the modification of financial reporting to conform to the reporting requirements of the Securities and Exchange Commission. The NCFE CFO, working with Price Waterhouse, analyzed all accounting policies and procedures and adjusted the financial records to meet the reporting requirements of the SEC. This process included a restatement of all prior year financial statements and the issuance of new audit opinions for all years. The required changes were not material, and the former, unqualified opinions were affirmed by the independent auditor. The second area of concern was NCFE's information systems. The accounting system needed upgrading and the financing systems required a reinvestment to insure its adequacy to meet expected growth in health care financing programs. As a result, NCFE embarked on a $12 million capital improvement program to make NCFE's information systems the most sophisticated in health care finance. These systems were thoroughly reviewed and found to be completely accurate in tracking the massive amounts of accounts receivable data from over 2,000 health care providers, coast to coast.

### Congressional Action Causing Anxiety.

46.    In 2001 and 2002, there was an atmosphere of public outrage over most notably the Enron fiasco, but also a series of other high-profile corporate scandals and abuses at, for example, WorldCom, Global Crossing and Arthur Andersen. This ratcheted up the pressure on J.P. Morgan Chase, which is a multi-billion financial institution with extensive ties to these companies mired in scandal, particularly Enron and its auditor, Arthur Andersen. ·J.P. Morgan Chase feared that it would be the next to suffer Andersen's fate of criminal conviction and demise. In reaction to corporate improprieties committed by Enron, WorldCom, Global Crossing, Adelphia and others, in February 2002, Congress introduced draft legislation that would later be ratified and known as the Sarbanes-Oxley Act ("SOX"), which was intended to generate greater fidelity of corporate officers in publicly held companies and of their independent auditors to the investor constituency. Many of the scandals that led to SOX had been financed by J.P. Morgan Chase, casting the shadow of impropriety on that firm. In 2001 and 2002, J.P. Morgan Chase was implicated in an SEC action related to Enron, which it settled for $135 million. Years later, the company paid $2.2 billion to settle a class action by Enron stock and bondholders. J.P. Morgan Chase was named as a Defendant in the WorldCom litigation as well, for its role in an accounting fraud that cost the WorldCom shareholders an estimated $200 billion. Given the firm's previous problems, the new legislation was worrisome for J.P. Morgan Chase and its managers, including Pote and Mendell.

47.    On July 30, 2002, President Bush signed SOX into law. SOX was the furthest reaching legislation involving publicly held companies and their audit firms since the Securities Act of 1933. SOX imposed duties to disclose, and certify as true and

accurate, the financial condition of public companies. It required increased financial transparency and accountability, and designed internal financial controls. Most importantly, SOX enhanced prison sentences for many securities law violations. Once SOX was enacted, private companies preparing for an initial public offering became subject to the provisions of the Act at the moment a registration statement was filed with the SEC.

48.     The most common transgressions addressed by SOX are related to "net profit overstatements using a creative variety of fraudulent accounting records affecting revenues, costs and expenses, or special reserves accounts."[1]  Three common deviations from accounting standards are:

- *Revenue recognition* – Sales booked without transfer of property; "round trip" transactions; deferred accounting discounts, rebates or guarantees; channel stuffing; collusion with vendors; and accounting of swaps as revenues. The Enron scheme is an example of round-trip trades as sales.

- *Reserves* – Manipulation of reserves is another tool used by dishonest executives to meet earnings targets. The discretionary nature of these accounts provides the opportunity to meet Wall Street forecasts by increasing or decreasing earnings at will.

- *Understatement of debt* – In the case of Enron, special purpose entities hid billions of dollars in debt. As debt was understated, equity was overstated, giving the investment community false impression of the company's financial soundness.

49.     Once NCFE had become a publicly held company, or had it even filed a registration statement, its financial transactions, and the actions of its directors and officers would have been even more closely scrutinized under the provisions of SOX. Anything resembling one of the above-described transgressions could have ultimately led to criminal penalties imposed upon the corporate heads and financial participants. This

---

[1] "The Sarbanes-Oxley Act and the Evolution of Corporate Governance", The CPA Journal (2005).

was particularly worrisome for Pote and Mendell as well as their employer J.P. Morgan Chase – the main culprit in the earlier scandal.

50.     With regard to NCFE, Sec. 705 of SOX, titled "Study of Investment Banks," would particularly apply to J.P. Morgan Chase, trustee and financial advisor, by requiring the Comptroller General of the United States to conduct a study on whether investment banks and financial advisers assisted public companies in manipulating their earnings and obfuscating their true financial condition. The Comptroller General of the United States was further required to study whether investment banks and financial advisers assisted public companies generally, in creating and marketing transactions which may have been designed solely to enable companies to manipulate revenue streams, obtain loans, or move liabilities off balance sheets without altering the economic and business risks faced by the companies or any other mechanism to obscure a company's financial picture.

51.     Section 404 of the SOX act makes managers responsible for maintaining an adequate internal control structure and procedures for financial reporting.  As per SOX, NCFE's auditors, Deloitte & Touche, would have to attest to management's assessment of these controls and disclose any material weaknesses.  Those found violating Section 404 would face stiff penalties.  All of this was a chance that J.P. Morgan Chase and its representatives, Pote and Mendell, were unwilling to take.

52.     Pote, Mendell, and J.P. Morgan Chase were especially concerned about the treatment of NCFE's SPVs under SOX.  SPVs had become notorious in the popular press as a result of their prolific use by Enron, which had deployed them (with the assistance of key financial institutions such as J.P. Morgan Chase) to serve unlawful

objectives. Enron used SPVs to hide liabilities in off-book accounts so they would not have to be reported to shareholders and the government. The use of SPVs made Enron's financial picture appear rosier than it truly was. J.P. Morgan Chase was embroiled in the Enron scandal. Indeed, the SEC and private Plaintiffs alleged that J.P. Morgan Chase assisted Enron's falsification of its financial statements and hiding of debt, while the bank's analysts were issuing falsely positive and misleading reports. The SEC further alleged that J.P. Morgan Chase aided and abetted Enron in violating Section 10(b) of the Exchange Act. Contrary to the practice at Enron, the use of SPVs that were bankruptcy remote by NCFE was a legitimate means of protecting assets. Pote and Mendell knew NCFE's SPVs were done correctly; however, they also knew that validation and verification of the legitimacy of NCFE's SPVs would necessarily reveal stark contrasts with Enron's SPVs, underscoring the fraudulent nature of the latter. This would further damage J.P. Morgan Chase, and subject the bank to enormous reputational damage and civil and criminal liability. Thus, throughout 2002, the individual Defendants' perspectives and goals became increasingly directed towards avoidance of adverse publicity, and, in particular, avoidance of civil and criminal liability, for themselves and their employer, J.P. Morgan Chase. The only way to avoid the potential liability for themselves and their employer, J.P. Morgan Chase, was to eliminate the potential for scrutiny. In other words, eliminate NCFE and its subsidiaries by taking them into bankruptcy.

### Secret Dealings and Unjustifiable Business Decisions.

53.    Through the first nine months of 2002, NCFE had continued to grow, with portfolios anticipated to be as high as $600 million in existing sales and "new store

sales." That represented a growth rate of 22% annually. The dividend coupons that had been issued by the Beacon Group, LLC (now J.P. Morgan Chase), continued to increase in value as NCFE's value increased. By the fall of 2002, J.P. Morgan Chase had recouped nearly all of its $40 million initial investment. Nevertheless, Pote and Mendell insisted that payments to J.P. Morgan Chase, their employer, receive priority. As a result, J.P. Morgan Chase had already recovered the initial investment by Beacon, and had received additional millions of dollars in fees.

54. As of September 30, 2002, NCFE was in good financial condition, and its books reflected approximately $3.8 billion in assets and approximately $3.6 billion in liabilities on a consolidated basis. The company had a run rate of $62 million in net profits and employed approximately 300 full and part time employees.

55. NPF VI continued to operate profitably and meet all of its program requirements throughout 2002. Investor reports were reviewed by the Trustee, J.P. Morgan Chase, and accepted after checking against actual account balances to ensure compliance with the Indenture requirements. The Trustee conducted the review on a monthly basis, and annually attested to the program's compliance. Moreover, on September 13, 2002, the trustee of NPF VI (J.P. Morgan Chase) confirmed and acknowledged, as evidenced by a letter signed by Jennifer Baran, an Account Officer at J.P. Morgan Chase, *inter alia* that the NPF VI account balance as of December 31, 2001 was $155,341,224.30, that the trustee had received all due investor reports, all interest reports were made in a timely fashion to the investors, that neither the Master Indenture nor the Sales and Servicing Agreements precluded NCFE or one of its subsidiaries or affiliates from maintaining a security interest in assets other than Receivables and further

that such security interests are not necessarily encumbered by NPF VI, and that transfers of collateral from NPF VI to another subsidiary or affiliate of NCFE are anticipated in the normal course of business such transfers being adjusted within a monthly period. Similarly, on September 10, 2002, the trustee of NPF XII (Bank One) confirmed and acknowledged as evidenced by a letter signed by John Rothrock, an Account Officer at Bank One *inter alia* that the NPF XII account balance as of December 31, 2001 was $234,905,570.97, that the trustee had received all due investor reports, all interest reports were made in a timely fashion to the investors, that neither the Master Indenture nor the Sales and Servicing Agreements precluded NCFE or one of its subsidiaries or affiliates from maintaining a security interest in assets other than Receivables and further that such security interests are not necessarily encumbered by NPF XII, and that transfers of collateral from NPF XII to another subsidiary or affiliate of NCFE are anticipated in the normal course of business and such transfers should be adjusted within a monthly period. Thus, the trustees of NPF VI and XII were both satisfied that NPF VI and XII were operating profitably and meeting all of their program requirements.

56.    As a condition precedent to a public offering in 2002 and to continue its business, NCFE needed an audit to ensure the corporation's financial welfare and set investors at ease. Pote was aware of this requirement, and as chairman of NCFE's Audit Committee, he was responsible for having it completed. At the April 11, 2002 NCFE board meeting in New York City, Pote reported that the audit was in the "final stages" and would be completed by the due date, June 30, 2002. He provided a draft audit that indicated that NCFE was a financially strong company and was ready for the Initial Public Offering. Unbeknownst to the non-J.P. Morgan Chase members of the Board,