# Exhibit A Continued

however, Pote's principal focus was on the implications for J.P. Morgan Chase of the high-profile downfalls of Enron and WorldCom, and he feared that revelation of J.P. Morgan Chase's public association with another company employing SPVs and off-balance-sheet accounting would either itself be damaging to the bank, or that the contrast revealed between how NCFE used SPVs and how J.P. Morgan Chase had used them in conjunction with its illicit support for Enron would expose both the bank and its key client Enron to further legal liability. Pote, in tandem with Mendell, determined that he would not allow the audit – a necessary precursor both to an IPO and to continued viability for NCFE and its subsidiaries – to be timely completed. This was a brutally effective means of stopping the NCFE businesses in their tracks, notwithstanding the absence of any justification for doing so. Notwithstanding its effect on any potential Initial Public Offering, the absence of an audit prevented the NCFE businesses from purchasing and securitizing additional health care receivables, which meant that NCFE could not pay off existing bonds and get more cash infused into its operations. Thus, without a completed audit, as of June 30, 2002, NCFE could not purchase any new notes, a necessary step to securitize new accounts receivable, a fact well known by Pote who was intimately involved in the affairs of NCFE to the extent that Lance Poulsen strongly considered him to be a potential successor to Lance Poulsen as President of NCFE. But the lack of an audit was not enough to prevent Lance and the other Directors from maintaining the companies, so P&M had to do more damage to succeed.

57. In the summer of 2002, NCFE still had no audit and NPF XII had $355 million of bonds due to be paid in either three months or six months. Handicapped by the lack of an audit, Lance Poulsen infused $5 million of his own money into the company in

an effort to steady it and sought to maintain the reserves in NPF XII by paying the $355 million in six months. Pote and Mendell told him he could not do that because that would make the bondholders, Credit Suisse First Boston and Bank One, nervous and jeopardize the continued funding of NPF XII. Thus the individual Defendants and Bank One convinced NCFE to pay the $355 million in three months on the claim that doing so would help with the initial public offering – an offering they knew would never happen. This weakened NCFE XII, setting it on the path to an event of default in October 2002 – the first in its history. Nevertheless, Pote and Mendell continued to promise an unqualified audit from Deloitte & Touche – an audit they knew would never occur.

58. Moreover, as an inducement to Poulsen to repay the $355 million on the needlessly expedited timetable mandated by the individual Defendants, they arranged for Credit Suisse First Boston ("CSFB") (NCFE's underwriter in the process of taking it public) to provide a bridge loan to Poulsen and NCFE through a Variable Financing Note ("VFN") in the amount of $150 million. However, when Poulsen received the first $75 million in connection with the VFN, he was quickly informed thereafter (as a consequence of machinations on the part of the individual Defendants) that he needed to repay that $75 million in order to receive the next $75 million, thus defeating the purpose of receiving the second installment. With $355 million only recently paid out on an accelerated time frame and an additional promised $75 million note no longer forthcoming, NCFE XII suddenly faced increasingly significant hurdles. These hurdles were attributable to the individual Defendants' influence in pushing for an accelerated payout to CSFB and Bank One, and their working behind the scenes to render the promised $150 million bridge loan essentially unusable.

59. Mendell was appointed to the Boards of NCFE, NPF VI and NPF XII on October 10, 2002. Pote replaced Eric Wilkinson in June 2002 because he disagreed with Pote's scheme. With Mendell on board and Wilkinson out of the way, the two J.P. Morgan Chase employees controlled each SPV, and were a substantial presence on the NCFE Board. In this environment, the two began to make unjustifiable and illegal maneuvers. During October 2002, Pote and Mendell met secretly with one of NPF VI's creditors, ING. At the same time, unaware of the behind-the-scenes activities of Pote and Mendell, Poulsen met with ING to secure its continuing participation in the program, which he was able to do. Specifically, on October 3 and 4, 2002, Lance Poulsen met with John Costa. Mr. Costa was the co-managing director of ING. As a result of these meetings, on October 8, 2002, ING agreed to renew a $500 million VFN in NPF VI that was coming due in one month. Unbeknownst to the Plaintiffs, however, a law firm that also represented Credit Suisse First Boston and NCFE was working in concert with J.P. Morgan Chase and its senior officials, including Pote and Mendell, to create a special fund outside of the terms of the NPF VI indenture. This was done without the knowledge or consent of the rating agencies, investors of NCFE or the Plaintiffs. Through this mechanism, ING received a $43 million payment and reneged on its written commitments regarding the renewal of the $500 million VFN, which caused NPF VI to be in serious financial jeopardy. Compounding the problem for Chase, during this time frame, Reuters reported on October 21, 2002 that "J.P. Morgan Chase & Co. Inc.'s stock surged on Monday on speculation that Bank One Corp. would buy the bank, which is struggling in a weak market...." Thus Pote and Mendell had to keep the merger partner and Trustee of XII, Bank One, from suffering any loss either.

60. Despite the fact that Poulsen had obtained the renewal, Pote and Mendell, in their dual capacities as controlling directors of NPF VI and participants on the Board of NCFE, approved and authorized the release of an unnecessary and improper $43 million payment to ING on October 31, 2002 from the Trustee account held by their employer, J.P. Morgan Chase. Their authorization of a preferential and groundless $43 million payment out of NPF VI, ING, constituted an abuse of their positions as directors of NPF VI. In addition to being unnecessary, this payment to ING was fundamentally in violation of the Indenture Agreement of NPF VI that governed all of its acts. This act was also contrary to the renewal agreement that Poulsen had negotiated with ING, and in direct violation of SEC regulations. The Defendants' actions would have led to criminal liability for them individually as well as for the Trustee (their employer) under Sarbanes-Oxley had NCFE completed its scheduled public offering, but these Defendants were well underway to ensuring that the planned initial public offering would never happen, and their misfeasance with regard to the $43 million payment gave them an additional substantial reason to keep it from happening. However, by making this payment, Pote and Mendell made sure that NPF VI would be around long enough so their employer, J.P. Morgan Chase, could be paid and their personal interests protected. Pote and Mendell had now moved their plan forward, but more remained to be done.

61. On November 2, 2002, Pote and Mendell secretly met with NPF VI and NPF XII investors as well as representatives from Bank One. There was no legitimate business purpose for the trustees of the two distinct SPVs to meet, except to discuss protecting their own assets for their future merger. Nevertheless, during the secret meeting(s), a plan was developed to bankrupt NCFE and its subsidiaries. Pote and

Mendell realized that their unauthorized release of $43 million to J.P. Morgan Chase's banking client ING was illegal, and could lead to liability under SOX. This unlawful act, which served both to weaken NCFE and benefit a J.P. Morgan Chase client, provided the Defendants with another reason that they had to ensure that NCFE and its subsidiaries were bankrupted. The only way for the Defendants to cover their tracks was to dissolve the companies. What remained was the removal of Lance Poulsen and dissenting voices, collapsing NPF VI, the "merger" of NPF VI and XII and the placing of NCFE and its subsidiaries in bankruptcy.

**The Final Dissolution.**

62. NPF XII had repaid $355 million in bonds earlier than necessary, at Pote and Mendell's insistence, to the great financial detriment of NPF XII. In addition, Pote and Mendell had illegally caused the release of $43 million to ING, thereby further weakening the financial health of the NCFE businesses. The payment of $43 million to ING was made to pacify ING while Pote and Mendell sought to protect their own interest, and those of their employer. Having moved NPF XII a step towards insolvency by forcing the premature $355 million payment, the Defendants continued with their plan to rid themselves and their employer of the threat that they believed NCFE's continued existence posed for them.

63. Pote and Mendell falsely told Poulsen that they had developed a plan to save NPF XII from the problems that in fact Pote and Mendell had foisted upon it. They claimed that the NPF XII investors would only resume providing funds that could be made available to the NCFE providers if Lance Poulsen resigned his position as director and officer of NCFE. Mr. Poulsen was told that his resignation was the "only option" to

save NPF XII from bankruptcy and insure the continued funding of the health care providers. Pote and Mendell claimed that Poulsen's departure would save the company from a "nuclear" wind down of the NPF XII investments, and assured Poulsen that he would continue to receive his salary and benefits. Because Pote and Mendell served as investor liaisons for the trustees, J.P. Morgan Chase and Bank One, they controlled the flow of information into and out of NCFE and were able to keep Poulsen out of the loop. Pote and Mendell's efforts to drive Poulsen from a position of influence neatly parallel J.P. Morgan Chase's experiences in trying to effect a far more justified "regime change" at Enron, where the bank had worked to oust CEO Kenneth Lay. Indeed, J.P. Morgan Chase operatives were so focused in 2002 on their employer's negative exposure as a consequence of its extraordinary measures on Enron's behalf to bolster the Company's purported balance sheet that they were doubtless driven to many of their misguided actions in connection with NCFE by perceiving everything through the prism of the bank's Enron-related misconduct and resulting liabilities.

64. To Pote and Mendell's disappointment Poulsen refused to resign on November 6, 2002, and was supported by directors other than Pote and Mendell. But the Defendants continued to pressure Poulsen, insisting that the only way to "save" the company was for him to resign. Poulsen ultimately resigned his positions with NCFE and its subsidiaries on November 8, 2002, in reliance on Pote and Mendell's representations and assurances that they personally would take all necessary steps to recruit independent directors and maintain the viability of the companies. Specifically, Pote and Mendell had, since October 2002 each been improperly filling the supposedly "independent" director position at each of NPF VI and NPF XII, though each actually

lacked the independence required by the master indenture agreements. They never did what they promised. Pote and Mendell authorized a press release dated November 8, 2002 reflecting that NCFE was financially healthy, stating in pertinent part that:

> The NCFE Board, in cooperation with investors, will immediately hire an operation manager reporting directly to the board. The operating manager will work with the trustees to resume funding to NCFE's customers. In addition, the manager will maintain and preserve the collateral value for investors in both NPF VI and XII.

At this point in time, NCFE's assets exceeded its liabilities, Mr. Poulsen had resigned with the assurances that his salary would be maintained and that the health care providers and NCFE employees would be unaffected. Pote and Mendell had successfully deceived the trustees and the public through their false press release.

65. Thus another step of Pote and Mendell's plan was complete: Lance Poulsen no longer had authority for the subsidiaries, so they were in complete control of NPF VI and NPF XII, as they were the only remaining "Independent Directors" in direct violation of the Indenture Documents, and Ohio law (ORC 1701.56) regarding the number of directors. The removal of Lance Poulsen was key to Pote and Mendell's scheme because both NPF VI and XII each required a unanimous vote of the formerly three-person board to take them into bankruptcy; with Lance Poulsen out of the way, no one could stand in the way of Pote and Mendell. Next Pote and Mendell had to overcome three other votes, those of Ayers, Parrett and Mrs. Poulsen, on the Board of NCFE. At the conclusion of the November 8, 2002 Board meeting, it was resolved that Pote and Mendell, in their capacities as Directors of National Premier Financial Services, Inc. ("NPFS")(the servicing arm of NCFE), NPF VI and NPF XII, "shall adopt a resolution to remove all of the existing officers of NPFS, NPF VI and NPF XII." With this resolution,

Pote and Mendell were assured that Lance and Barbara Poulsen, as well as Ayers and Parrett, would be gone too.

66. Then Pote and Mendell shifted their focus to the NCFE Board and demanded that all of the remaining founders of the Company (Ayers and Parrett) as well as Mrs. Poulsen, due to her relationship to Mr. Poulsen, resign. Ayers and Parrett were told that they needed to resign due to potential conflicts created by their status as shareholders. Both Pote and Mendell, of course, had deeper conflicts, monetary and otherwise, yet they refused to resign. Resignation, of course, would not offer protection from prosecution under SOX. Ayers and Parrett objected, stating that only they had the day-to-day knowledge to run the company. Indeed, Ayers had previous experience with operating a "workout team," a tool used to ensure the successful wind down of a company. But Pote and Mendell told them that they had to give up control or the company would fail because the investors, plus Bank One, and J.P. Morgan would continue to support the company only if Pote and Mendell were in charge. In fact, anticipating this objection, Pote and Mendell had already fashioned a plan: Ayers, Parrett and Mrs. Poulsen were assured that Alvarez & Marsal, an allegedly experienced crisis management team, would take over. The Plaintiffs were not told that 85% of Alvarez & Marsal work was referred by J.P. Morgan Chase. Neither were the Plaintiffs made aware that Alvarez & Marsal had no experience in the area of collecting collateral, which was NCFE's business. Adding fuel to the fire, Alvarez & Marsal was apparently given instructions by Pote and Mendell, in their control positions, not to collect collateral. Indeed, Alvarez & Marsal achieved the dubious distinction of having one of the lowest collection ratios of any major bankruptcy firm in history. This is not surprising, given that

David J. Coles from Alvarez & Marsal, the acting Chief Executive Officer and President of NCFE, later admitted that he has never read the indentures for NPF VI or NPF XII, despite the fact that it was his responsibility to complete the "analysis" of whether or not there was collateral to substantiate the purchase of receivables by NPF VI and NPF XII.

67. Pote and Mendell secretly knew this, but failed to share it with the Plaintiffs, because Alvarez & Marsal was their "go to" firm. Pote and Mendell publicly trumpeted their plan as one simply of "reorganization," and allayed the fears of the former directors with promises of consultation, especially with regard to NPF VI and NPF XII funding, and continued observation rights at any NCFE Board meeting. Thus Ayers, Parrett and Mrs. Poulsen resigned from NCFE at the second meeting November 8, 2002, based on the representations from Pote and Mendell. Ayers and Poulsen agreed to assist in any way they could to recover the accounts receivable, but Pote and Mendell later rejected these agreements despite their absolute lack of experience in running the company and the Plaintiffs' long history of doing so.

68. In retrospect, it is evident that Pote and Mendell refused to pursue the collection of receivables because they had no intention to continue NCFE, NPF VI, or NPF XII. Pote and Mendell were secretly intent on driving each company into bankruptcy. The execution of this plan, however, required Pote and Mendell to act in contravention of the Master Indentures of NPF VI and NPF XII. Both indentures specifically delineate that their respective companies are to operate under Ohio law at all times. Ohio law, specifically ORC 1701.56, provides "the number of directors as fixed by the articles or the regulations shall be not less than three or, if not so fixed, shall be

three..." Pote and Mendell, operating as the two remaining members of the Board of Directors, were acting in violation of both the Master Indentures and Ohio law.

69. With Lance and Barbara's Poulsen's votes, as well as those of Ayers and Parrett, eliminated, Pote and Mendell were now in control and could protect their own liability, and that of their employer J.P. Morgan, as well as its interests in its pending merger with Bank One. Pote and Mendell also had another safety device in place: Originally the Board minutes were kept by Barbara Poulsen. Pote and Mendell now decided that Barbara Poulsen would no longer take the minutes. Rather, Pote and Mendell arranged that a non-director would do so. Plaintiffs do not have access to the signed minutes, but the unsigned copies obtained by the Plaintiffs contain numerous inaccuracies.

70. Unbeknownst to the Plaintiffs, Pote and Mendell had a tremendous personal downside to the continued existence of NCFE and its subsidiaries. They and their employer could potentially be left holding a $3 billion loss once the Securities and Exchange Commission, the investors and the financial media discovered that Pote, Mendell, J.P. Morgan and Bank One were the responsible parties, most particularly Pote as chairman of the audit committee. Accordingly, their only alternative to save themselves was to put NCFE, NPF VI and NPF XII into bankruptcy. Ayers, a health care provider workout expert, alerted Pote and Mendell of the deleterious effects bankruptcy would have on the health care providers and further informed Pote and Mendell of the need for an experienced workout team to ensure maximum recovery of assets. Of course, Pote and Mendell never worried themselves with the effect bankruptcy would have on NCFE or its clients. Pote and Mendell were concerned solely for their personal exposure

and the interests of their employer. Pote and Mendell were well aware that SOX was enacted in response to the recent scandals and that it resulted in increased exposure for them both. However, their anxiety was more than just personal.

71. While the fate of NCFE hung in the balance, Pote and Mendell were concerned about J.P. Morgan Chase and its future merger partner, Bank One. Bank One was an indenture trustee of NPF XII, a $2 billion asset backed portfolio. J.P. Morgan Chase was a trustee of NPF VI, a $1 billion asset backed portfolio. Pote and Mendell knew they had to avoid any collateral damage not only to J.P. Morgan Chase, but also to Bank One. Pote and Mendell also sought to protect their present and future stock ownership in both J.P. Morgan and Bank One. Given that J.P. Morgan Chase and Bank One both were indenture trustees and fiduciaries on behalf of the Noteholders, they both saw tremendous legal advantages to a potential bankruptcy of NCFE, as opposed to a public exposure of their involvement in another financial scandal.

72. Predictably, the resignation of four members of the NCFE Board was a cause of alarm for NPF XII investors, not a boon to further investment, and the stage was set for the demise of a once great and profitable company.

73. On November 18, 2002, ten days after Lance Poulsen resigned to "save" the company, Pote and Mendell put NCFE and its subsidiaries into bankruptcy and terminated all employees' benefits without notice. There was no ongoing litigation that would cause, or even hint of, the necessity for bankruptcy. Further, the bankruptcy of NPF VI and XII was completely unnecessary given the bankruptcy remote features of both NPF VI and XII. Pote and Mendell's removal of any objectors from the board of directors and the disastrous action of placing NPF VI and XII into bankruptcy all but

assured the "success" of their scheme, but one more fraudulent act was still required. To facilitate their plan, Pote and Mendell caused Lance Poulsen's signature to be affixed to key documents by using his signature stamp without authorization. Pote and Mendell were aware and/or should have been aware that this usage was unauthorized.

74. On November 21, 2002, NCFE, acting through the only remaining directors, Pote and Mendell, terminated Ayers and Mrs. Poulsen's observation rights agreement regarding any NCFE Board meeting. Ayers' compensation, insurance and retirement benefits were also terminated without notice, violating a condition of his resignation. Moreover, the NCFE key man insurance coverage was terminated without notice to Ayers, Parrett and Lance Poulsen, as well as the pension plan for retirement benefits. Pote and Mendell also ensured that the pension fund was never funded even though out-sourced funds were raised and placed in trust for this specific purpose. The cessation of these earned benefits was consistent with Pote and Mendell's blatant violation of their fiduciary duties to the other directors, officers and their investors in instructing "turnaround specialist" Alvarez & Marsal, which they hired for the NCFE entities' purported benefit, to forgo recovery of available assets and receivables that would have, at a minimum, benefited NCFE's creditors and would have allowed the NCFE entities to reemerge from the bankruptcies improperly inflicted upon them by the individual Defendants' bad acts.

75. Moreover, because of Pote and Mendell's actions and inactions, NPF VI's financially sound portfolio was caused to go into default, losing over $1 billion for investors in the company once NCFE filed for bankruptcy. Pote and Mendell thus temporarily protected themselves, J.P. Morgan Chase and their future employer, Bank

One, by destroying the company that had been started by the Plaintiffs and had been on the threshold of an initial public offering before the Defendants' elaborate plan. The entire scheme was carried out within the scope of their employment at J.P. Morgan Chase, and for the benefit of J.P. Morgan. Not surprisingly, both are still employed by the merged entity at high levels of income and power. They have been rewarded for their transgressions.

76. Having ousted Lance Poulsen from control of these businesses, the defendants immediately undertook a campaign to besmirch Lance Poulsen's reputation and character, wrongly contending that the bankruptcies had resulted from misconduct on his part. It is instructive in this regard that, though initial media reports and investigative inquiries into NCFE's business affairs focused on Poulsen, he has to this day, after thorough review and full cooperation with the investigating authorities, never been charged with any criminal misconduct or civilly penalized by any governmental or regulatory body.

77. From the date of bankruptcy until May 16, 2003, Alvarez & Marsal, the debtor in possession, represented the NCFE Board. On May 16, 2003, Ayers, Parrett, and Lance and Barbara Poulsen were voted in as NCFE Board members. At a May 22, 2003 NCFE Board meeting, Pote and Mendell objected to votes for a new chairman, vice chairman, and retention of new counsel to the Board. Effective May 30, 2003, Pote and Mendell resigned from the NCFE Board. Because J.P. Morgan Chase and the Trustee for NPF XII, its future merger partner Bank One, spread the false story that NCFE was beset by financial improprieties for which Lance Poulsen was at fault, the Poulsens, though never indicted or penalized for any wrongdoing, and never sued by J.P. Morgan Chase or

any of the individual Defendants for any wrongdoing, have been stymied in their efforts to rekindle their successful businesses and formerly favorable business reputations. J.P. Morgan Chase, by contrast, together with the individual Defendants, has reaped exactly what it had so assiduously sought to avoid by driving NCFE and its subsidiaries into bankruptcy. As a final irony, The Unencumbered Trust, the entity representing NCFE and the other "Debtors," has not sued Pote and Mendell, but has sued Lance and Barbara Poulsen. However, the Unencumbered Trust has now filed an amended complaint recognizing that, upon further inquiry, the Poulsens and Mr. Ayers were not the true culprits; meanwhile, officers of J.P. Morgan Chase, including Joe Giordano, remain targeted in the suit. The Defendants are increasingly at the center of lawsuits and inquiries focused on their own mishandling, and irresponsible stewardship, of the NCFE businesses. They assumed that they could manage risk by taking extreme measures such as ushering soon-to-be public companies into needless bankruptcy upon even the faintest hint of what they misconstrued as impropriety, but they failed to consider that SOX and other laws could still punish them for malfeasance as public company actors overseeing the affairs of private businesses. This lawsuit brings these injustices to light for the first time, forcing Pote and Mendell to answer for their misdeeds.

**COUNT ONE**
**(Fraud)**

78. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

79. Pote and Mendell made false representations of material facts to the Plaintiffs as described above, including, among other things, that the audit for the year of 2001 would be completed; that the $150 million loan would be available; that the

Plaintiffs had to resign from NCFE and its subsidiaries to protect the companies; that they immediately would recruit additional and independent directors; and that they would take all necessary steps to ensure that the companies would remain viable. Ultimately, they also falsely represented that the companies were not solvent and cast them into unjustified bankruptcies on that basis.

80. Pote and Mendell further knowingly and intentionally misrepresented to Lance Poulsen that his stepping down from NCFE would prevent a nuclear wind down of the NPF VI and NPF XII, that he would receive all of his salary and benefits and continue on the NCFE board, and that he would be able to consult with NCFE. Each of these representations was knowingly and intentionally false.

81. At all times when Pote and Mendell made their false representations to the Plaintiffs, as alleged in the preceding paragraphs, Pote and Mendell actually knew that their representations were false, and they expected and intended that the Plaintiffs would rely upon their representations. Moreover, they were acting within the scope of their employment with J.P. Morgan Chase, with its full authority, and at its direction.

82. Pote and Mendell made their false representations for the purpose of defrauding the Plaintiffs.

83. As alleged above, the Plaintiffs relied upon Pote and Mendell's false representations, and under the circumstances, which included the Defendants' fiduciary relationships with the Plaintiffs, the Plaintiffs had the right to rely upon the false representations with full belief in their truth. The Plaintiffs would not have resigned their positions at the companies and permitted Pote and Mendell to remain as directors and assume control, if not for their false representations.

84. As a direct result of the false representations as detailed above and Plaintiffs' reliance on those false representations in ignorance of their falsity, the companies were forced into an unnecessary bankruptcy and the Plaintiffs suffered extensive damages and losses.

85. But for the Plaintiffs' justifiable reliance upon Pote and Mendell false representations, NCFE and its subsidiaries would not have been placed into bankruptcy, and the public Preferred Stock offering would have occurred to the added financial benefit of the Plaintiffs.

86. Had Pote and Mendell not engaged in the fraud detailed above, the Plaintiffs would have altered course such that the Plaintiffs' losses would have been avoided.

87. Pote and Mendell did further transfer to others, lose and waste corporate assets due to neglect of and failure to perform, and other violation of Pote and Mendell's duties.

88. Punitive damages are appropriate because of Pote and Mendell's willful, reckless and wanton disregard of their obligations to the Plaintiffs as well as their flagrant misconduct that was part of a pattern directed to the public generally, involving gross and high moral culpability, and the need to punish and deter Pote and Mendell from future misconduct.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages, and $3 billion as punitive damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT TWO**
**(Fraudulent Concealment)**

89. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

90. Pote and Mendell had a duty fully and fairly to disclose their plans to the Plaintiffs.

91. As described above, Pote and Mendell knowingly, willfully, intentionally and fraudulently failed to disclose to the Plaintiffs, and knowingly, willfully, intentionally and fraudulently concealed from Plaintiffs, the material facts regarding the nature and extent of their above-referenced scheme to place NCFE and its subsidiaries into bankruptcy so as to protect their own interests and those of their employer. At all relevant times Pote and Mendell were acting within the scope of their employment and to the benefit of J.P. Morgan Chase, and were acting at its direction.

92. Pote and Mendell concealed these material facts with intent to deceive the Plaintiffs. Pote and Mendell actually knew that the Plaintiffs would have acted in a different manner if the Plaintiffs had known of the existence of the concealed facts, and Pote and Mendell expected that the Plaintiffs would rely upon the non-existence of the concealed facts.

93. As described above, the Plaintiffs acted in justifiable reliance on the nonexistence of the concealed facts.

94. The Plaintiffs suffered damage and loss directly resulting from the fraudulent concealment as detailed above, which enabled the Defendants to place NCFE and its subsidiaries into unnecessary and improper bankruptcies.

95. But for the Plaintiffs' justifiable reliance upon Pote and Mendell's fraudulent concealment of their serious conflicts of interest, NCFE and its subsidiaries would not have been placed into bankruptcy, and the Preferred Stock offering would have occurred to the financial benefit of the Plaintiffs.

96. Had Pote and Mendell not engaged in fraudulent concealment, the Plaintiffs would have altered course such that the Plaintiffs' losses would have been avoided.

97. Pote and Mendell did further transfer to others, lose and waste corporate assets due to neglect of and failure to perform, and other violation of Pote and Mendell's duties.

98. Punitive damages are appropriate because of Pote and Mendell's willful, reckless and wanton disregard of their obligations to the Plaintiffs as well as their flagrant misconduct that was part of a pattern directed to the public generally, involving gross and high moral culpability, and the need to punish and deter Pote and Mendell from future misconduct.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages and $3 billion as punitive damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT THREE**
**(Breach of Fiduciary Duty)**

99. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

100. Pote and Mendell served as members of the board of directors of NPF VI, NPF XII and NCFE. Pote was head of NCFE's audit committee. J.P. Morgan Chase was trustee of NPF VI.

101. Pote and Mendell, in their capacities as directors of NCFE and its subsidiaries, were in a fiduciary relationship with the Plaintiffs and accountable to them to act for the benefit of NCFE and its subsidiaries with loyalty, care and good faith, without any self-interest or self-dealing. Moreover, Pote and Mendell were required to act with full disclosure of all material and significant information.

102. Pote and Mendell knowingly breached their fiduciary duties by covertly planning the bankruptcy of NCFE and its subsidiaries, even though there was no financial reason to do so, all while actively engaged on the board of NCFE and its subsidiaries. At all relevant times, Pote and Mendell were acting within the scope of their employment and to the benefit of J.P. Morgan Chase, which breached its fiduciary duties to NPF VI.

103. Had Pote, Mendell and J.P. Morgan Chase not breached their fiduciary duties, the Plaintiffs would have altered course such that the Plaintiffs' losses would have been avoided.

104. By virtue of Defendants' breaches of their respective fiduciary duties and the confidential relationship among Pote and Mendell, NCFE and its subsidiaries and the Plaintiffs, the Plaintiffs have sustained damages, including but not limited to the loss of

personal funds and the value of the Preferred Stock once the Initial Public Offering was made and thereafter.

105. Pote and Mendell did further transfer to others, lose and waste corporate assets due to neglect of and failure to perform, and other violation of Pote and Mendell's

106. Punitive damages are appropriate because of Pote and Mendell's willful, reckless and wanton disregard of their obligations to the Plaintiffs as well as their flagrant misconduct that was part of a pattern directed to the public generally, involving gross and high moral culpability, and the need to punish and deter the defendants from future misconduct.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages and $3 billion as punitive damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT FOUR**
**(Civil Conspiracy)**

107. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

108. Pote and Mendell served as members of the Board of Directors of NPF VI, NPF XII and NCFE, and Pote was head of NCFE's audit committee.

109. As set forth above, without the consent or agreement of NCFE or its subsidiaries, Pote and Mendell conspired by agreement or understanding to, among other things, covertly plan the bankruptcy of NCFE and its subsidiaries, even though there was no financial justification to do so, all while actively engaged on the board of NCFE and

its subsidiaries. Pote and Mendell violated the legal rights of the Plaintiffs. At all relevant times, Pote and Mendell were acting within the scope of their employment and to the benefit of J.P. Morgan Chase, and at its direction.

110. By virtue of Pote and Mendell's civil conspiracy, the Plaintiffs have sustained damages, including but not limited to the loss of personal funds and the value of the Preferred Stock once the Initial Public Offering was made and thereafter.

111. Had Pote and Mendell not engaged in the civil conspiracy detailed above, the Plaintiffs would have altered course such that the Plaintiffs' losses would have been avoided.

112. Punitive damages are appropriate because of Pote and Mendell's willful, reckless and egregious disregard of their obligations to the Plaintiffs as well as their flagrant misconduct that was part of a pattern directed to the public generally, involving gross and high moral culpability, and the need to punish and deter Pote and Mendell from future misconduct.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages, $3 billion in punitive damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT FIVE**
**(Negligent Misrepresentation)**

113. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

114. Pote and Mendell served as members of the Board of Directors of NPF VI, NPF XII and NCFE, and Pote was head of NCFE's audit committee.

115. Because they were co-directors and fiduciaries with the Plaintiffs, Pote and Mendell were in a special fiduciary relationship with the Plaintiffs.

116. Pote and Mendell had duties of care to impart correct information to the Plaintiffs based on their fiduciary relationship.

117. Pote and Mendell made false representations of material facts to the Plaintiffs as described above, including, among other things, that the audit for the year of 2001 would be completed; that the $150 million loan would be available; that the Plaintiffs had to resign from NCFE and its subsidiaries to protect the companies; that they immediately would recruit additional and independent directors; and that they would take all necessary steps to ensure that the companies would remain viable. Ultimately, they falsely represented that the companies were not solvent.

118. Pote and Mendell further knowingly and intentionally misrepresented to Lance Poulsen by their assurances that Lance Poulsen's stepping down from NCFE would prevent a nuclear wind down of the NPF VI and NPF XII investors and that Lance Poulsen would receive all of his salary and benefits and continue on the NCFE board as well as consult with NCFE were knowingly and intentionally false.

119. Pote and Mendell intended the Plaintiffs to rely upon their misrepresentations, ultimately to their detriment.

120. At all relevant times, Pote and Mendell were acting within the scope of their employment and to the benefit of J.P. Morgan Chase.

121. In reliance on Pote and Mendell's misrepresentations and assurances, Lance Poulsen resigned from his positions with NCFE and its subsidiaries so that a nuclear wind down of NPF XII program would be avoided.

122. Had Pote and Mendell not made the above misrepresentations, the Plaintiffs would have altered course such that the Plaintiffs' losses would have been avoided.

123. Moreover, in reliance on Pote and Mendell's misrepresentations and assurances that bankruptcy would not occur and that Pote and Mendell would act in the best interests of NCFE and its subsidiaries, the Plaintiffs have sustained damages, including but not limited to the loss of personal funds and the value of the Preferred Stock once the Initial Public Offering was made and thereafter.

124. The Plaintiffs were unaware of the falsity of the Defendants' statements and representations at the time the statements and representations were made.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT SIX**
**(Intentional Misrepresentation)**

125. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

126. Pote and Mendell served as members of the Board of Directors of NPF VI, NPF XII and NCFE, and Pote was head of NCFE's audit committee. In addition, Pote and Mendell held themselves out to be experts in amortization of issued notes and as such served a fiduciary and advisory role to the board of directors of NCFE.

127. Because they were co-directors and fiduciaries with the Plaintiffs, Pote and Mendell were in a special relationship with the Plaintiffs.

128. Pote and Mendell also had duties of care to transmit accurate information to the Plaintiffs.

129. Pote and Mendell made false representations of material facts to the Plaintiffs as described above, including, among other things, that the audit for the year of 2001 would be completed; that the $150 million loan would be available; that the Plaintiffs had to resign from NCFE and its subsidiaries to protect the companies; that they immediately would recruit additional and independent directors; and that they would take all necessary steps to ensure that the companies would remain viable. Ultimately, they falsely represented that the companies were not solvent.

130. Pote and Mendell further knowingly and intentionally misrepresented to Lance Poulsen by their assurances that Lance Poulsen's stepping down from NCFE would prevent a nuclear wind down of the NPF VI and NPF XII and that Lance Poulsen would receive all of his salary and benefits and continue on the NCFE board as well as consult with NCFE were knowingly and intentionally false.

131. Pote and Mendell intended the Plaintiffs to rely upon their misrepresentations, ultimately to their detriment. At all relevant times, Pote and Mendell were acting within the scope of their employment and to the benefit of J.P. Morgan Chase, and at its direction.

132. In reliance on Pote and Mendell's knowing and intentional misrepresentations and assurances, Lance Poulsen resigned his positions with NCFE and its subsidiaries so that a nuclear wind down of NPF XII program would be avoided.

133. Moreover, in reliance on Pote and Mendell's knowing and intentional misrepresentations and assurances that bankruptcy would not occur and that Pote and Mendell would act in the best interests of NCFE and its subsidiaries, the Plaintiffs have sustained damages, including but not limited to the loss of personal funds and the value of the Preferred Stock once the Initial Public Offering was made and thereafter.

134. Had Pote and Mendell not made the above intentional misrepresentations, the Plaintiffs would have altered course such that the Plaintiffs' losses would have been avoided.

135. The Plaintiffs were unaware of the falsity of the Defendants' statements and representations at the time the statements and representations were made and at the time of their reliance.

136. Punitive damages are appropriate because of Pote and Mendell's willful, reckless and wanton disregard of their obligations to the Plaintiffs as well as their flagrant misconduct that was part of a pattern directed to the public generally, involving gross and high moral culpability, and the need to punish and deter the defendants from future misconduct.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages, $3 billion as punitive damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT SEVEN**
**(Gross Negligence)**

137. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

138. Pote and Mendell had a duty to the Plaintiffs, who were co-directors, to act reasonably in their capacities as directors of NCFE and its subsidiaries.

139. Pote and Mendell were grossly negligent as described above, including but not limited to, their failure to exercise appropriate care for the interests of the Plaintiffs when they instead acted to protect J.P. Morgan Chase's reputation and its secretly impending merger with Bank One to the detriment of the Plaintiffs, and their failure to exercise appropriate care in making their perfidious and unethical transfers of monies. Pote and Mendel's transfer of monies --- either deliberately or with reckless and thoughtless indifference to its obligations to NCFE and their fellow directors --- was grossly negligent and constitutes willful and wanton misconduct. At all relevant times, Pote and Mendell were acting within the scope of their employment and to the benefit of J.P. Morgan Chase.

140. As a direct and proximate result of the above-referenced gross negligence and reckless indifference, the Plaintiffs incurred substantial economic losses and damages.

141. Had Pote and Mendell faithfully performed their duties, the Poulsens would have altered course such that their losses would have been avoided.

142. Pote and Mendell did further transfer to others, lose and waste corporate assets due to neglect of and failure to perform, and other violation of Pote and Mendell's duties.

143. Punitive damages are appropriate because of Pote and Mendell's, their willful, reckless and egregious disregard of their obligations to the Plaintiffs as well as their flagrant misconduct that was part of a pattern directed to the public generally,

involving gross and high moral culpability that was part of a pattern directed to the public generally, and the need to punish and deter the defendants from future misconduct.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages, $3 billion as punitive damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT EIGHT**
**(Negligence)**

144. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

145. Pote and Mendell had a duty to the Plaintiffs, who were co-directors, to act reasonably in their capacities as directors of NCFE and its subsidiaries and to safeguard the Plaintiffs' interests in those companies.

146. Pote and Mendell were negligent as described above, including but not limited to, their failure to exercise appropriate care for the interests of the Plaintiffs when they instead acted to protect J.P. Morgan Chase's reputation and its secretly impending merger with Bank One to the detriment of the Plaintiffs, and their failure to exercise appropriate care in making their perfidious and unethical transfers of monies. Pote and Mendel's transfer of monies --- either deliberately or with reckless indifference to its obligations to NCFE and their fellow directors --- was negligent. At all relevant times, Pote and Mendell were acting within the scope of their employment and to the benefit of J.P. Morgan Chase.

147. As a direct and proximate result of the above-referenced gross negligence and reckless indifference, the Plaintiffs incurred substantial economic losses and damages.

148. Had Pote and Mendell faithfully performed their duties, the Poulsens would have altered course such that their losses would have been avoided.

149. Pote and Mendell did further transfer to others, lose and waste corporate assets due to neglect of and failure to perform, and other violation of Pote and Mendell's duties.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**COUNT NINE**
**(Constructive Fraud)**

150. Plaintiffs incorporate herein the previous paragraphs as if those paragraphs were fully set forth again.

151. Pote and Mendell made false representations of material facts to the Plaintiffs as described above, including, among other things, that the audit for the year of 2001 would be completed; that the $150 million loan would be available; that the Plaintiffs had to resign from NCFE and its subsidiaries to protect the companies; that they immediately would recruit additional and independent directors; and that they would take all necessary steps to ensure that the companies would remain viable. Ultimately, they also falsely represented that the companies were not solvent and cast them into unnecessary bankruptcy.

152. Pote and Mendell further falsely represented to Lance Poulsen that his stepping down from NCFE would prevent a nuclear wind down of the NPF VI and NPF XII, that he would receive all of his salary and benefits and continue on the NCFE board, and that he would be able to consult with NCFE.

153. At all times when Pote and Mendell made their false representations to the Plaintiffs, as alleged in the preceding paragraphs, Pote and Mendell expected and intended that the Plaintiffs would rely upon their representations. Moreover, they were acting within the scope of their employment with J.P. Morgan Chase, with its full authority, and at its direction.

154. Pote and Mendell made their false representations for the purpose of defrauding the Plaintiffs.

155. As alleged above, the Plaintiffs relied upon Pote and Mendell's false representations. Under these circumstances, which included the fiduciary relationship that Pote and Mendell, as fellow Directors, and J.P. Morgan Chase, as the Trustee of NPF VI had with the Plaintiffs, the Plaintiffs had the right to rely upon the false representations with full belief in their truth. The Plaintiffs would not have resigned their positions at the companies and permitted Pote and Mendell to remain as directors and assume control, if not for their false representations.

156. As a direct result of the false representations as detailed above, the companies were forced into an unnecessary bankruptcy and the Plaintiffs suffered extensive injury in the form of monetary damages and losses.

157. But for the Plaintiffs' justifiable reliance on Pote and Mendell's false representations, NCFE and its subsidiaries would not have been placed into bankruptcy,

and the public Preferred Stock offering would have occurred to the added financial benefit of the Plaintiffs.

158. Had Pote and Mendell not engaged in the fraud detailed above, the Plaintiffs would have altered course such that the Plaintiffs' losses would have been avoided.

159. Pote and Mendell did further transfer to others, lose and waste corporate assets due to neglect of and failure to perform, and other violation of Pote and Mendell's duties.

160. Punitive damages are appropriate because of Pote and Mendell's willful, reckless and egregious disregard of their obligations to the Plaintiffs and the NCFE companies as well as their flagrant misconduct that was part of a pattern directed to the public generally, involving gross and high moral culpability, and the need to punish and deter the defendants from future misconduct.

WHEREFORE, the Plaintiffs ask and demand that judgment be entered against the Defendants, jointly and severally, in the amount of $1 billion as compensatory damages, and $3 billion as punitive damages, plus costs and interest and reasonable attorney's fees and expenses of litigation.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial in this matter

Stephen L. Snyder
Roy L. Mason
Andrew G. Slutkin

Philip R. Stein
Robert H. B. Cawood
SNYDER SLUTKIN & SNYDER
1829 Reisterstown Road, Suite 100
Baltimore, MD 21208
410-653-3700

Lead Counsel For The Plaintiffs

FELLIG, FEINGOLD,
EDELBLUM & SCHWARTZ, LLC
821 Franklin Avenue, Suite 203
Garden City, NY 11530
(516) 338-4720

By: Thomas J. Fellig, Esq.
Audra L. Schwartz, Esq.
Local Counsel

Dated: November 9, 2005
51858

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

LANCE K. POULSEN AND BARBARA POULSEN,

Plaintiffs,

v.

HAROLD W. POTE, THOMAS G. MENDELL AND J.P. MORGAN CHASE & CO.,

Defendants.

SUMMONS AND COMPLAINT

FELLIG, FEINGOLD, EDELBLUM & SCHWARTZ, LLC
*Attorney(s) for* Plaintiffs, Lance and Barbara Poulsen

*Office Address & Tel. No.:*

821 Franklin Avenue, Suite 203
Garden City, New York 11530
(516) 338-1720

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and ~~belief and reasonable~~ inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:* November 7, 2005 Signature ..........

Print Signer's Name: Thomas J. Fellig — Audra L. Schwartz,

*Service of a copy of the within* *is hereby admitted.*

*Dated:*

*Attorney(s) for*

*PLEASE TAKE NOTICE*

Check Applicable Box

☐ NOTICE OF ENTRY — *that the within is a (certified) true copy of a entered in the office of the clerk of the within named Court on 20*

☐ NOTICE OF SETTLEMENT — *that an Order of which the within is a true copy will be presented for settlement to the Hon. one of the judges of the within named Court, at on 20 , at M.*

*Dated:*

*Attorney(s) for*

*To:* *Office Address & Tel. No.:*

*Attorney(s) for*