UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LANCE K. POULSEN and BARBARA
POULSEN,

      Plaintiffs,

      -against –

HAROLD W. POTE, THOMAS G.
MENDELL and J.P. MORGAN
CHASE & CO.,

      Defendants.

Civil Action No. 05CV10575

## AFFIDAVIT

State of Ohio      )
County of Franklin  ) ss:

      John E. Haller, being duly sworn, deposes and says:

      1.    This affidavit is based on personal knowledge of the matters set forth herein, and I am an adult over the age of eighteen (18) who is competent to testify in a court of law.

      2.    I am counsel of record in the case of *In re National Century Financial Enterprises, Inc.*, pending in the United States Bankruptcy Court for the Southern District of Ohio Eastern Division, case number 02-65235, adversary proceeding number 03-02288.

      3.    I received a copy of the attached "Memorandum Opinion" of the aforementioned court, authored by Donald E. Calhoun, Jr., United States Bankruptcy Judge, and the copy attached to the Plaintiffs' Motion to Remand or in the alternative Motion for Abstention is a true and accurate copy.

      I do solemnly declare and affirm under the penalties of perjury that the contents of the foregoing document are true and correct to the best of my knowledge, information and belief and that I am competent to testify to the matters set forth herein.

_____

John E. Haller

The foregoing instrument was acknowledged before me on December 28, 2005.

Notary Public

CHRISTINE J. TUNANIKIS
Notary Public, State of Ohio
My Commission Expires 07-17-10

My Commission Expires: _07-17-10_

**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**

Dated: January 10, 2005

Donald E. Calhoun, Jr.
United States Bankruptcy Judge

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re | : | Case No. 02-65235 |
| | : | Jointly Administered |
| National Century Financial | : | |
| Enterprises, Inc., an Ohio | : | |
| corporation, *et al.*, | : | |
| | : | |
| Debtors. | : | |
| | : | |
| National Century Financial | : | |
| Enterprises, Inc., an Ohio | : | |
| corporation, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. Pro. No. 03-02288 |
| | : | |
| Gulf Insurance Company, Inc., | : | |
| *et al.*, | : | Judge Calhoun |
| | : | |
| Defendants. | : | |

MEMORANDUM OPINION

This case presents the questions of how and to what extent limited proceeds from a directors and officers insurance policy should be distributed to various and distinct insured claimants, including a bankrupt entity and directors and officers of that entity. In accordance with our analysis of the insurance policy and state and federal case authority as set forth hereinafter, we determine that (1) the "entity coverage" provision under the insurance policy allows the Debtor, National Century Financial Enterprises, Inc., a limited right to a portion of the insurance proceeds, and (2) the directors and officers must share the proceeds on a *per capita* basis, instead of on the actual amount of litigation costs accrued.

## I.    BACKGROUND FACTS

National Century Financial Enterprises, Inc., ("NCFE")[1] is an Ohio corporation. On November 18, 2002 (the "Petition Date"), NCFE filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Prior to the Petition Date, the Debtors were one of the country's largest providers of healthcare accounts receivable financing. The Debtors financed and serviced more than $15 billion in healthcare accounts receivable. Historically, the Debtors financed the purchase of eligible receivables primarily through private placement sales of bonds to institutional

---

[1]NCFE's Fourth Amended Joint Plan of Liquidation was confirmed on April 16, 2004. Pursuant to the plan, one of the successor parties-in-interest to NCFE, the Unencumbered Assets Trust, is charged with the prosecution of this case. This Court will refer to the Unencumbered Assets Trust and related NCFE entities mostly as NCFE.

investors. All of the Debtors' outstanding bonds as of the NCFE bankruptcy petition date were issued by subsidiaries of NCFE, particularly NPF VI, Inc. and NPF XII, Inc.

In October and November, 2002, just prior to NCFE's bankruptcy petition date, events of default were declared against NPF VI, NPF XII, and NCFE by institutions financing NCFE's accounts receivable program. It has been alleged that a great deal of accounting fraud was committed by NCFE employees, directors and officers, and that the fraud along with risky financing resulted in more than a $2.6 billion loss for NCFE and its subsidiaries. NCFE's bankruptcy directly or indirectly precipitated a great deal of litigation around the country. Numerous cases were filed by NCFE's creditors and investors outside of the bankruptcy forum against NCFE's officers, directors and affiliated institutions.[2]

Prior to the Petition Date, NCFE entered into two separate directors and officers insurance policies. The primary policy with Gulf Insurance Company ("Gulf Policy") provided D & O coverage in the amount of $5 million. The excess policy, with Great American, provided coverage for $5 million upon the exhaustion of the Gulf

---

[2]Most of the non-bankruptcy litigation has been consolidated into a multi-district litigation ("MDL") format in the United States District Court, Southern District of Ohio with case number 2:03-MD-1565-JLG_MRA. Some of the consolidated cases include: Pharos Capital Partners, L.P. v. Deloitte & Touche, L.L.P., et al., No. 2:03cv362 (S.D.Ohio); Metropolitan Life Ins. Co., et al. v. Bank One, N.A., et al., No. 2:03cv1882 (D.N.J.); Lloyds TSB Bank, plc v. Bank One, N.A., et al., No. 2:03cv2784 (D.N.J.); City of Chandler, et al. v. Bank One, N.A., et al., No. 2:03cv1220 (D.Ariz.); Parrett v. Bank One, N.A., et al., No. 2:03cv541 (D.Ariz.); State of Arizona, et al. v. Credit Suisse First Boston, et al., No. 2:03cv1618 (D.Ariz.); Crown Cork Seal Co., Inc., et al. v. Credit Suisse First Boston, et al., No. 2:03cv2084 (D.Ariz.); New York City Employees' Retirement System, et al. v. Bank One, N.A., et al., No. 1:03cv9973 (S.D.N.Y.); ING Bank N.V. v. JPMorgan Chase Bank, No. 1:03cv7396 (S.D.N.Y.); Bank One, N.A., v. Poulsen, et al., No. 2:03cv394 (S.D.Ohio).

Policy. Both policies were purchased on or about March 28, 2002, with the policy period to run between March 28, 2002 and March 28, 2003. Pursuant to both policies, at the expiration of the policy period, NCFE had the option to an extended discovery period for one year to bring claims that arose during the original policy period. NCFE exercised this option and purchased from both insurers the additional one-year extended discovery period. It is the proceeds from the Gulf Policy that are at issue in the adversary proceeding.

## II.  PROCEDURAL HISTORY

On September 17, 2003, NCFE filed its Second Amended Complaint for Declaratory and Injunctive Relief seeking:

    a.    a declaration that the insurance policies were not void
          as to the various NCFE entities on the basis of
          misstatements in the applications;

    b.    a declaration of a fair and equitable procedure for
          determining allocation of policy proceeds to all
          claimants;

    c.    a declaration of the proportional share of each claimant
          to the policy proceeds; and

    d.    an injunction enjoining Gulf Insurance and Great
          American from making any disbursements from the Policy
          proceeds other than in conformance with a determination
          by the Court.

Gulf Insurance Company then filed a Motion to Deposit Policy Limit into Court and Obtain Discharge of all Liability Under Policy, which the Court granted. Pursuant to this Court's order granting Gulf's motion, Gulf deposited $5,000,000.00 (the

"Proceeds") into an escrow account.  The Court must presently make
(1) a determination as to which claimants are insured under the
Gulf Policy and (2) an allocation of the Proceeds amongst the
insured claimants.

Great American submitted its answer to NCFE's Second Amended
Complaint.  In addition, Great American asserted counterclaims
seeking rescission of its D & O policy, or, in the alternative,
declaratory judgment that its D & O policy was null and void due
to fraud and misrepresentations.  Subsequently, after a number of
procedural motions, this Court ordered that all claims, cross-
claims, counterclaims and defenses concerning Great American Excess
Insurance Policy be severed from all other claims in the present
adversary.  The Court severed Great American's claims because (1)
there was pending Great American's motion to withdraw reference[3],
(2) Great American was contesting liability, and (3) the parties,
especially the former directors, wanted to expedite the process of
allocating the Gulf Proceeds.

III.  FACTUAL FINDINGS

In order to expedite the trial process, all parties involved
submitted a stipulation of facts, which, along with findings, are
delineated below in pertinent parts.

---

[3]Unlike Great American, Gulf consented to the jurisdiction of this Court by depositing the Proceeds in an
escrow account under the direction of this Court.

A.   *The Claimants*

Seven former directors and officers along with the NCFE entities make a claim to the Proceeds.   The four "founding" directors of NCFE were Lance Poulsen, Barbara Poulsen, Rebecca S. Parrett, and Donald Ayers (sometimes hereinafter collectively "Founding Directors").

      9.    Ayers was a director and officer of National Century Financial Enterprises, Inc. during the entire Policy Period.

      8.    Ayers provided written notice of the above mentioned Claims in a timely manner under the terms of the [Gulf] Policy.

    10.    Rebecca S. Parrett, an individual, is a former officer and director of National Century Financial Enterprises, Inc.

    14.    Within the Gulf Insurance Policy period and/or the applicable tail period, Ms. Parrett provided Gulf Insurance with notice of the Claims against Ms. Parrett.

    11.    Ms. Parrett has been named as a defendant in [at least] six (6) cases in the Multi-District Litigation.[4]

    12.    Ms. Parrett was also under investigation in United States Securities and Exchange Commission Formal Order of Investigation, Case No. C-03688-A, styled as *In the Matter of National Century Financial Enterprises, Inc.*, which arose from alleged wrongful acts of Ms. Parrett.

    21.    Lance Poulsen is a former officer and director of National Century Financial Enterprises, Inc. Barbara Poulsen is a former director of NCFE. Both Lance Poulsen and Barbara Poulsen [collectively "Poulsens"] were officers or

---

[4] See n. 2 *supra*.

directors of NCFE during all times relevant to the Gulf Policy at issue in this litigation.

22.  The Poulsens have been named in [individually or collectively in at least 10] . . . MDL cases.

23.  The Poulsens were also named as defendants in the case of *Bank One v. Lance Poulsen, et al.*  The *Bank One* case arises from alleged wrongful acts by the Poulsens in their positions as officers and/or directors of NCFE.

24.  The Poulsens have been the subject of an investigation by the Securities and Exchange Commission under Formal Order of Investigation, Case No. C-03688-A.

The three "outside" or "JPMorgan" directors of NCFE as of the Petition Date were Harold W. Pote, Thomas G. Mendell, and Eric R. Wilkinson (collectively "Outside Directors").  At least ten different suits have been filed against the Outside Directors that are related to the Outside Directors' relationship with NCFE.

29.  The Outside Directors are "Insured Persons" as defined in the Policy.

32.  The Outside Directors have provided timely notice to Gulf of the proceedings listed in the preceding two paragraphs.

There are at least four separate D & O policies issued through JPMorgan that provide coverage separate from the Gulf Policy to the Outside Directors.  As of the date of the trial, the Outside Directors have incurred fees and expenses totaling $3,902,245.27 for defense of bankruptcy and MDL claims, which have been indemnified by either JPMorgan or JPMorgan's D & O insurers.  Through August 31, 2004, the Poulsens have incurred at least $591,953.53 in litigation costs connected with the NCFE bankruptcy.

Rebecca Parrett has incurred at least $762,424.52.  Mr. Ayers has

thus far incurred at least $189,859.00 in legal fees and expenses.

NCFE also makes a claim to the $5,000,000.00 Gulf Proceeds.

The directors contest NCFE's claim to the Proceeds.  NCFE purchased

the Gulf D & O policy in March, 2002 and subsequently renewed the

policy in March, 2003.  NCFE provided adequate notice to Gulf under

the terms of the policy for the losses and fees it has incurred.

> 4.   The amount of the Noteholder Deficiency Settlement is
>      $2,609,891,501, subject to upward adjustment pursuant to
>      the terms of the Debtors' Plan of Liquidation.
>
> 5.   The total amount of professional fees and expenses
>      incurred  and  paid  by  the  Debtors'  estates  is
>      $51,260,882.33.

B.  *Wrongful Acts*

To disqualify NCFE as an insured claimant, the directors and

officers claim would need to establish that wrongful acts of former

employees could be imputed to NCFE and thereby disqualify the

entity from a right to the Proceeds.    The following are the

stipulated acts of former employees:

> 33.  On December 8, 2003, Brian J. Stucke entered a plea of
>      guilty in the United States District Court for the
>      Southern District of Ohio to a charge of Conspiracy to
>      Use Interstate Commerce of [sic] the Purpose of Fraud in
>      the Sale of Securities, 18 U.S.C. § 371.
>
> 34.  On August 18, 2003, Sherry L. Gibson ("Gibson"), a
>      former  executive  of  National  Century  Financial
>      Enterprises, Inc., entered a plea of guilty in the
>      United States District Court for the Southern District
>      of Ohio to a charge of Conspiracy to Use Interstate
>      Commerce for the Purpose of Fraud in the Sale of
>      Securities, 18 U.S.C. § 371.

35. The Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code for the Fourth Amended Joint Plan of Liquidation of National Century Financial Enterprises, Inc. and its Debtor Subsidiaries, dated January 13, 2004 states: "[i]n her plea, Gibson admitted that, beginning in 1995, she prepared or directed others to prepare investor reports containing false financial information. Ms. Gibson further admitted that these actions defrauded investors in the Notes.  In his plea, Stucke admitted that, beginning no later than July 15, 1999, with guidance and direction from other executives and owners of the Debtors, he prepared or directed others to prepare investor reports containing false financial information. Stucke further admitted that these actions defrauded investors in the Notes."

C. The Gulf Policy

The Gulf Policy is the document that provided liability coverage for the individual directors and officers of NCFE. A brief description and delineation of relevant portions of the Gulf Policy are necessary.

Definitions:

Insured Person(s) means the Director(s), Officer(s), and with respect to an Employment Claim and/or a Securities Claim, Employee(s).

Insured Company(ies) has the meaning specified in Item 1 of the Declarations.

Loss means the total amount which the Insured Preson(s) become legally obligated to pay as the result of all Claims . . . or with respect to Insuring Clause C and D only which the Insured Company becomes legally obligated to pay as the result of all Claims . . . for covered Wrongful Acts. . . .

Wrongful Act means any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed or attempted, or allegedly committed or attempted, by one or more Director or Officer, individually or collectively, in their respective capacities as such or, with respect to an Employment Claim or a Securities Claim only, an Employee, or with respect to Insuring Clause C only by the Insured Company, or any matter claimed against

one or more Director(s) or Officer(s) solely by reason of their status as such.

EXCLUSIONS

No Wrongful Act of any Insured Person shall be imputed to another Insured Person for purposes of applying any exclusion.

The Insurer shall not be liable to make any payment for Loss in connection with any Claim:

F.    for any Wrongful Act(s) committed or allegedly committed by any Insured Company or its Directors, Officers or Employees while such Insured Company was not a Subsidiary; however, if before or during the Policy Period any entity ceases to be a Subsidiary, coverage with respect to such Subsidiary and its Directors, Officers and Employees shall continue until the Policy Termination Date but only with respect to Claims for Wrongful Acts taking place while such entity was a Subsidiary.

        The Gulf Policy specifies in Item 1 that the "Insured Company" is National Century Financial Enterprises, Inc. It does not contain a "priority of payments" section, listing who should take first or most in the event where claims to proceeds exceed the aggregate amount that can be paid under the Policy.

IV.    DISCUSSION

        The Court must resolve two main issues in this proceeding. First, whether NCFE is an insured claimant under the Gulf Policy, and if it is an insured claimant, whether under the Gulf D & O Policy NCFE's claims should be excluded. Second, given the limited amount of Proceeds, the amount that should be allocated between the various insured claimants.

A.  *Indemnification Coverage, Entity Coverage and Exclusions*

The Gulf D & O Policy is subject to a $5,000,000.00 "aggregate limit of liability." This limit obligates Gulf to pay no more than $5,000,000.00 for all attorneys' fees, settlements, judgments or indemnification on behalf of any insured person or entity. Essentially, under this limit, if the claims exceed $5,000,000.00, any one dollar spent on behalf of one person or entity means one less dollar available to another insured person or entity.

The total claims of all seven directors and NCFE far exceed the $5,000,000.00 that is available under the Gulf Policy. Further, of all the claims, NCFE's claim is by far the largest. NCFE has incurred more than $2.6 billion in noteholder deficiency losses and more than $51,000,000.00 in professional expenses. If NCFE is determined to be an insured claimant and if NCFE's claims are not subordinated in some fashion, NCFE would take the overwhelming majority of the Proceeds. The directors and officers thus contest that (1) there is no entity coverage under the Gulf D & O Policy and (2) even if there was entity coverage, NCFE is excluded because Wrongful Acts of certain former employees can be imputed to NCFE.

The language of insurance policies governs the policy's interpretation when it is clear and unambiguous. Goodyear Tire & Rubber Co. v. Aetna Casualty & Surety Co., 769 N.E.2d 835, 840 (Ohio 2002) (citing Rhoades v. Equitable Life Assurance Soc'y of

the United States, 347 N.E.2d 643 (Ohio 1978)). It is clear under
the Gulf Policy that indemnification and entity coverage is
available. First, the losses incurred by NCFE come withing the
Gulf Policy's definition of Claim. Second, NCFE is an Insured
Company under the Policy and Insuring Clause C states that Gulf
would pay for any Loss incurred by NCFE specifically as a result
of a Claim for a Wrongful Act. Further, NCFE is an Insured and
Insuring Clause D states, "[t]he Insurer will pay on behalf of
Insured(s) all of the Insured(s) reasonable attorney fees, costs,
charges and expenses incurred in defending and/or investigating a
Claim . . . however, in no event shall there be coverage under this
Insuring Clause D for Loss in connection with any Claim
specifically excluded by Section 4, Exclusions A, C, H, and/or
J(8)." Under Insuring Clauses C and D, NCFE's claims for
noteholder deficiency losses and attorneys' fees and expenses are
payable.

The seven directors, however, argue that the Exclusions
provisions of the Gulf Policy exclude NCFE from coverage. The
directors specifically argue that the Wrongful Acts of Sherry L.
Gibson and Brian J. Stucke, both former employees who pleaded
guilty to conspiracy to commit fraud, exclude NCFE's claims. They
point to Section 4.F which states that the Insurer shall not be
liable to make any payment for Loss in connection with any Claim
"for any Wrongful Act(s) committed or allegedly committed by any
Insured Company or its Directors."

The Court believes that the directors' analysis is based on an incomplete reading of the Gulf Policy. Insuring Clauses C and D both in one form or another are exempt from the Exclusions 4.F Wrongful Acts provision of the Gulf Policy. Insuring Clause C states, "[t]he Insurer will pay on behalf of the Insured Company Loss . . . up to the available maximum aggregate Limit of Liability . . . and which Loss is incurred by the Insured Company as the result of any Claim first made . . . *for a Wrongful Act*." (emphasis added). Insuring Clause C directly makes claims payable for a Wrongful Act. Thus, the noteholder deficiency settlement of more than $2.6 billion is specifically not excluded by Insuring Clause C. Similarly, NCFE's professional fees and expenses are not excluded by Insuring Clause D because that clause, while specifically referring to Exclusions 4.A, 4.C, 4.H and 4.J(8), does not refer to Exclusions 4.F, which is the exclusion for Wrongful Acts. The Court holds NCFE's claims are payable under the Gulf Policy. This sort of entity coverage has been recognized by other courts as well when D & O insurance policies specifically allow for such coverage. In Adelphia Communications Corp. v. Associated Electric & Gas Insurance Services, Ltd. (In re Adelphia Communications Corp.), 285 B.R. 580, 591 (Bankr. S.D.N.Y. 2002),

rev'd 298 BR.49 (S.D.N.Y. 2003), *remanded to* 302 B.R. 439 (Bankr.

S.D.N.Y.) (internal citations omitted) [hereafter "Adelphia I"][5],

the court stated, "[b]y contrast, where the debtor has had a

material interest in the proceeds of a D & O policy for its own

economic exposure . . . courts have recognized the interest of the

debtor in the policy proceeds as well as the policy itself, with

the result that the proceeds too are property of the estate." See

also Homsy v. Floyd (In re Vitek), 51 F.3d 530, 535 (5th Cir. 1995);

In re Leslie Fay Companies, Inc., 207 B.R. 764, 785 (Bankr.

S.D.N.Y.1997).

---

[5] In Adelphia I, the court was asked to lift stay for various purposes by various insurers and directors. The insurers sought relief from stay to try and get declaratory judgments determining that policy exclusions applied to any defense costs incurred or judgments suffered by the directors. The insurers also sought recission of the policies. Id. at 584-91. Some directors sought relief to permit them to make claims against the D & O policy insures for defense costs and to proceed with litigation against the D & O insurers if the insurers disclaimed liability under their policies. Id. Explaining that there was potential entity coverage and that one of the two insured entities had a strong need to maintain coverage and preserve policy proceeds, the court held it would only lift stay to the extent of permitting the insured directors to receive, "if the Insurers are agreeable to doing so, up to $300,000 per insured on account of defense costs." Id. at 585. The court denied the insurers' motion for relief from stay to adjudicate recission and liability issues. Id. at 585-86.

On appeal, the United States District Court partially vacated the bankruptcy court decision. The District Court held that while debtors had potential claims under the D & O policies for indemnification, they did not have a property interest in the proceeds such that the policies were protected by the stay. In re Adelphia Communications Corp. et al., 298 B.R. 49, 54 (S.D.N.Y.) [hereinafter "Adelphia II"]. Further, the District Court found that the potential adverse impact of litigation between the directors and the insurers was insufficient foundation for extension of stay. Id. at 55. Essentially, the District Court believed that the potential for entity coverage or indemnification coverage in the D & O policies did not make the proceeds from the D & O policies part of the estate.

Although the Adelphia I decision was vacated, this Court will still rely on its holdings, dicta, and analysis. The District Court in Adelphia II vacated the bankruptcy court decision and lifted the stay especially because it held that the entity coverage and indemnification coverage was only theoretical. If the entity coverage in that case was held to be actual by the District Court, as in this case, it is unlikely that the bankruptcy case would or could have been vacated. In any event, this Court believes that the analysis of the various issues in Adelphia I, which are of first impression (see *infra* IV.B.1), is pertinent and sound.

*B. Allocation*

This Court is faced with the dilemma of distributing $5,000,000.00 in proceeds against more than $2.6 billion in allowable claims. As stated above, the Gulf Policy does not contain a "priority of payments" section and there is otherwise no provision that guides the allocation method. The Court must look, therefore, to equity and case authority for guidance.

In their pre-trial briefs and at trial, the parties make various suggestions and arguments as to the appropriate allocation method. NCFE argues that the Court should strictly make a *pro rata* distribution -- that is, divide the Proceeds proportionally according to the amount of losses. The directors vehemently argue against such an approach because under the *pro rata* approach NCFE would take virtually all of the Proceeds. Alternatively, NCFE argues that (1) the Founding Directors should be paid their actual costs, (2) the Outside Directors' actual expenses should be prorated because their litigation fees and expenses are indemnified by JPMorgan and JPMorgan's four D & O insurers, and (3) the rest of the Proceeds should be distributed to NCFE. Under this approach, NCFE would get about 3/5ths of the Proceeds. The Outside Directors object to this approach and argue that NCFE has not proven that the Outside Directors are indemnified by JPMorgan or by JPMorgan's four D & O insurance policies.

The Outside Directors urge the Court to either disallow or subordinate NCFE's losses and than make a *pro rata* distribution.

The Founding Directors and NCFE object to this method because it would reward the Outside Directors' extremely expensive litigation strategy. The Founding Directors urge the Court to (1) subordinate or disallow NCFE's losses, (2) allow only a fifth of the Outside Directors' costs because of the JPMorgan indemnification the Outside Directors have available, (3) pay their actual costs, and (4) establish a reserve fund for their inevitable future litigation costs and liability losses. NCFE and the Outside Directors both object to the Founding Directors' approach to allocation.

Instead of addressing individually the arguments of the parties, the Court will first address whether NCFE's claims should be subordinated and then determine on what basis the Proceeds should be distributed to the insured claimants. Finally, the Court will address whether the availability of separate indemnification to the Outside Directors should affect the distribution.

## 1. Subordination

Without some sort of subordination of claims, NCFE will take the mammoth portion of the Proceeds. This would not serve the underlying reason for the issuance of D & O policies. This Court will look to case authority to determine if NCFE's claims can be at least partially subordinated.

The allocation of D & O policy proceeds between directors and an entity where both claim coverage is a fairly novel issue. Even though there is a fair amount of case authority dealing with issues of the automatic stay and property of the estate within the context

of D & O policies, this Court has not found a single bankruptcy
case where the court has been asked to purely allocate D & O
proceeds between a debtor entity and its directors and officers.
Adelphia I, although primarily dealing an automatic stay issue to
preserve D & O policy proceeds for the estate, addressed many of
the issues that are relevant to this Court's inquiry. Discussing
the Fifth Circuit Court of Appeals case of In re Vitek, 51 F.3d 530
(5th Cir. 1995), Adelphia I described the novelty as follows:

Underscoring the distinction, the Fifth Circuit in Vitek, a
chapter 7 case, noted that, at one extreme, when a debtor
corporation owns a D & O policy that exclusively covers its
directors and officers, the proceeds of that policy are not
part of the bankruptcy estate, and at the other extreme, when
it had such a policy that covered its own liability vis-a-vis
third parties, the proceeds would be estate property too.
See 51 F.3d at 535.  But noting that while it was in the
position of knowing 'how to resolve cases on either end of
the continuum,' the Fifth Circuit thereafter stated:

But we have not yet grappled with how to treat the
proceeds of a liability policy when (1) the policy-
owning debtor is but one of two or more coinsureds or
additional named insureds, (2) the rights of the other
coinsured(s) or additional named insured(s) are not
merely derivative of the rights of one primary named
insured, and (3) the aggregate potential liability
substantially exceeds the aggregate limits of available
insurance coverage.

Id. . . . The Fifth Circuit noted '[w]hen ultimately we are
faced with such a mid-continuum case,' it would have to
decide whether to wholly include the proceeds in the debtor's
bankruptcy case (even though there would be other co-insureds
with an interest in the proceeds) or somehow divide the
proceeds among all coinsureds (either per capita or in
proportion to potential or actual liability), but that the
case then before it was not one that forced it to decide
which of those or possibly other positions to take.  Id.

Adelphia I, at 591 n.11.

In its analysis <u>Adelphia I</u> noted, however, that some courts have recently started to comment on this sort of a "mid-continuum" issue.  <u>Id.</u> at 597 (citing <u>Ochs v. Lipson (In re First Central Financial Corp.)</u>, 238 B.R. 9 (Bankr. E.D.N.Y. 1999); <u>In re Youngstown Osteopathic Hospital Ass'n</u>, 271 B.R. 544 (Bankr. N.D.Ohio 2002); <u>In re CyberMedica, Inc.</u>, 280 B.R. 12 (Bankr. D.Mass. 2002); <u>In re Enron Corp.</u>, 2002 WL 1008240 (Bankr. S.D.N.Y. May 17, 2002); <u>Executive Risk Indemnity, Inc. v. Boston Regional Medical Center, Inc. (In re Boston Regional Medical Center, Inc.)</u>, 285 B.R. 87 (Bankr. D.Mass.2002)) [collectively hereinafter "Quasi Mid-Continuum Cases"].  Although neither the <u>Adelphia I</u> nor the other Quasi Mid-Continuum Cases were purely allocation cases, this Court will look to those decisions for guidance, especially because all six of the Quasi Mid-Continuum Cases at least in part subordinate the claims of the entity.

In the Quasi Mid-Continuum Cases along with <u>Adelphia I</u>, the analysis started with whether the D & O policies provided either indemnification or entity coverage, which ultimately was the basis for the debtor entities to make a claim for the D & O policy proceeds. In all of those cases, the debtor entities staked at least a theoretical indemnification or entity coverage claim to the D & O policy proceeds against the claims of directors and officers.[6]

The court in <u>Adelphia I</u> in analyzing the Quasi Mid-Continuum Cases, stated that "in all but one those cases, notwithstanding claims by the estate on the policies in parallel with director and

---

[6]

| Case Name | Indemnification | Entity Coverage |
|---|---|---|
| *Adelphia I*, 285 B.R. 580. | The policies provide indemnification coverage for covered matters. 285 B.R. at 586. | There is entity coverage for securities actions under the primary policy. There were two "excess" policies which did not provide entity coverage. 285 B.R. at 586-87 n. 7. |
| *Youngstown Osteopathic Hospital Ass'n*, 271 B.R. 544. | Indemnity coverage provided for the company. 271 B.R. at 550. | No entity coverage. 271 B.R. at 550-51. |
| *Boston Regional Medical Center, Inc.*, 285 B.R. 87. | Indemnification coverage provided. 285 B.R. at 88. | No entity coverage outside of that provided by the indemnification coverage. 285 B.R. at 88-89. |
| *CyberMedica, Inc.*, 280 B.R. 12. | Indemnification coverage provided. 280 B.R. at 14. | Entity coverage for third party claims. 280 B.R. at 14. |
| *Enron Corp.*, Case No. 01-16034 | Indemnification coverage provided. *Adelphia I*, 285 B.R. at 597 n. 25. | Entity coverage subject to "priority of payments" that subordinated coverage to the rights of diretors and officers. *Adelphia I*, 285 B.R. at 597 n. 25. |
| *First Central Financial Corp.*, 238 B.R. 9. | Indemnification coverage provided. 238 B.R. at 13-14. | Entity coverage for securities claims. 238 B.R. at 14. |

officer insureds, the court did not permit the estate's claims to
block the director and officer insureds' effort to secure policy
proceeds for defense costs – and in the one remaining case it did
not do so wholly." Adelphia I, at 597.   The Adelphia I court was
especially impressed by this analysis of the First Central
Financial Corp., which was subsequently endorsed by Youngstown
Osteopathic Hospital Ass'n, 271 B.R. at 550, and CyberMedica Inc.,
280 B.R. at 16-17:

> *D & O policies are obtained for the protection of individual*
> *directors and officers. Indemnification coverage does not change*
> *this fundamental purpose.* There is an important distinction between
> the individual liability and the reimbursement portions of a D &
> O policy. The liability portion of the policy provides coverage
> directly to officers and directors, insuring the individuals from
> personal loss for claims that are not indemnified by the
> corporation. Unlike an ordinary liability insurance policy, in
> which a corporate purchaser obtains primary protection from
> lawsuits, a corporation does not enjoy direct coverage under a D
> & O policy. It is insured indirectly for its indemnification
> obligations. *In essence and at its core, a D & O policy remains a*
> *safeguard of officer and director interests and not a vehicle for*
> *corporate protection.*

Adelphia I, 285 B.R. at 597 (citing First Central Financial
Corp., 238 B.R. at 16) (italicized emphasis in Adelphia I).

On the logic that D & O policies are generally for the
protection of the directors and officers, the Adelphia I court
lifted stay to allow "meaning payments [to directors and officers]
on account of defense costs . . ." Id. at 600.   Adelphia I
reasoned that "bankruptcy courts should be wary of impairing the
contractual rights of directors and officers even in cases where
the policies provide entity coverage as well.   The Court believes

that if directors and officers are to serve, they need to have comfort in knowing that bankruptcy courts will be slow in depriving them of contractual rights under the D & O policies upon which they may have relied in agreeing to serve." Id. at 598.

Pursuant to reasoning in Adelphia I, Youngstown Osteopathic Hospital Ass'n, First Central Financial Corp., and especially because there are no contrary provisions in the Gulf Policy or in state law, this Court will subordinate the indemnification and entity coverage claims of NCFE and will not allow for a direct prorated distribution based on actual losses. Contra In re Boston Regional Medical Center, Inc., 285 B.R. 87, 94 (Bankr.D.Mass. 2002) (indicating, preliminarily, that a pro rata or equal distribution may be made under D & O policies where claims exceed aggregate limit). As held above, NCFE has had more than $2.6 billion in deficiency settlement claims and more than $51 million in professional and attorneys fees, which are payable under the Gulf Policy. If a simple prorated distribution is made under the directors and officers policy, the directors and officers of NCFE would get virtually nothing for their defense costs. Not only would a strict proration be inequitable, but it would subvert the actual intent of D & O insurance policies, which are primarily for the benefit of directors and officers. See In re Louisiana World Exposition, Inc., 832 F.2d 1391, 1398-99 (5th Cir.1987) (citing Note, Liability Insurance for Corporate Executives, 80 Harv.L.Rev. 648, 666-67 (1967)); First Central Financial Corp., 238 B.R. at 16.

However, NCFE's claims cannot be completely subordinated. See Adelphia I, 285 B.R. at 580 (recognizing the interest of the debtor entities in D & O policies and proceeds as well as that of the directors and officers)[7]. The Gulf Policy contains a strong entity coverage provision. Unlike Adelphia I or the other Quasi Mid-Continuum Cases, entity coverage is not limited to securities claims in the Gulf Policy. Further, the NCFE's successor-in-interest, the Unencumbered Assets Trust, is a shell set up for the benefit of NCFE's numerous creditors. These creditors have suffered real and adverse economic consequences as a result of NCFE's bankruptcy. This Court believes that a proper balance is to make a 70 percent distribution of the Proceeds to the directors for their defense costs and a 30 percent distribution to the Unencumbered Assets Trust (essentially NCFE's creditors) to allow it to recoup the myriad of costs it has incurred as a result of NCFE's (and its directors) financial irresponsibility and perhaps fraud.

2. Allocation of Proceeds Between the Directors

The Gulf Policy itself does not contain provisions dictating allocation methods between insured directors and officers. The Court must thus look to other authority and equity to allocate the remaining Proceeds. There are seven insured directors in this

---

[7] *But see supra* n. 5. In Adelphia II, 298 B.R. at 54, based on a difficult reading of the D & O policies, the District Court on appeal held that entity and indemnification coverage was at best theoretical and hence the debtor entities did not have a right to the proceeds.

case.  Lance and Barbara Poulsen collectively have accumulated litigation expenses of $591,953,53.  Mr. Ayers has thus far incurred at least $189,859.00 in legal fees and expenses. Rebecca Parrett has incurred at least $762,424.52. The Outside Directors, comprising Messrs. Pote, Mendell, and Wilkinson, have incurred fees and expenses of $3,902,245.27.  The total allowable claims for the directors exceed the $3.5 million available for the directors under the Gulf Policy.

There are two obvious methods for allocating the remaining Proceeds between the directors, either *pro rata* or *per capita* distribution.  Under the *pro rata* method, directors would get the same percentage (as versus the same dollar amount) of their actual defense fees and expenses.  Under a *per capita* approach, the directors would receive an equal amount of the remaining Proceeds without taking into account their actual costs.

Generally, where several claims arising under one liability policy are joined in one suit against the insurer whose maximum liability under the policy is inadequate to pay in full the amounts to which the claimants become entitled, it has been held that the proceeds are to be distributed on a *pro rata* basis in accordance with the amount of damage suffered by each claimant. <u>See Generally</u> <u>Bennett v. Conrady</u>, 180 Kan. 485, 305 P.2d 823 (1957); <u>Guarisco v.</u> <u>Swindle</u>, 132 So. 2d 643 ( La. Ct. App. 1st Cir. 1961); <u>Wondrowitz</u> <u>v. Swenson</u>, 132 Wis. 2d 251(Ct. App. 1986).  Further, "[w]henever several persons are all entitled to participate in a common fund,

or are all creditors of a common debtor, equity will award a
distribution of the fund . . . in accordance with the maxim,
Equality is equity; in other words, if the fund is not sufficient
to discharge all claims upon it in full, or if the debtor is
insolvent, equity will incline to regard all the demands as
standing upon equal footing and will decree a *pro rata* distribution
or payment." <u>Burchfield v. Bevans</u>, 242 F.2d 239 (10th Cir. 1957)
(citing <u>Century Indemnity Co. v. Kofsky et al.</u>, 115 Conn. 193
(1932)).

Although equity generally dictates a *pro rata* distribution
where there are numerous claims to limited proceeds, this Court
believes that equity would be better served if a *per capita*
approach is taken in this case. There is one overriding reason for
this method. Despite the fact that all the directors are
implicated in one way or another in NCFE's bankruptcy and the MDL
litigation, the expenses and fees they have accrued are uneven.
The Outside Directors, between the three of them, have thus far
accrued more than $3.9 million in fees and expenses. Mr. Ayers,
on the other hand, has accrued about $190,000 in defense costs.

This apparent unevenness indicates that theoretically a
*pro rata* approach would reward an expensive litigation strategy to
the detriment of an economical one. There are limited funds
available to the directors for their defense costs and the
directors will inevitably accrue a great deal more defense (and
perhaps judgment) costs as the NCFE and MDL litigation move

forward.  Given that defense costs of the directors have and will
far exceed the amount of available proceeds, equity would dictate
that each party be given an equal amount to use as they see fit.
This Court will thus take a *per capita* approach and divide the
remaining Proceeds evenly among the seven directors.

3.  Allocation between the Outside Directors' Multiple Policies

NCFE and the Founding Directors argue that the Court should
take into account other avenues of funds available to the Outside
Directors.  Specifically, they argue that because the Outside
Directors are currently being indemnified for defense costs by
JPMorgan, and there are **at least** four JPMorgan D & O policies[8]
available to the Outside Directors, they should either receive no
distribution or the distribution should be prorated between the
policies.  The Outside Directors argue that it has not been proven
that the four JPMorgan D & O policies provide coverage to them.
Thus, they urge the Court to disregard the other JPMorgan D & O
policies.

There were a number of evidentiary and procedural disputes at
trial with regard to the four JPMorgan D & O policies.  In trying
to resolve those disputes, the Court gave the Outside Directors an
opportunity at another date to prove or disprove any argument or
fact that they felt was necessary.  The Outside Directors chose not

---

[8]For purposes of confidentiality, which was sought by the Outside Directors and agreed to by the other
parties, this Court will not disclose the insurers or the specific terms of the four policies.

to present any witnesses or evidence at trial as afforded by the Court.

It has been stipulated that JPMorgan has paid for the Outside Directors' defense costs.  Further, upon a reading of the four JPMorgan D & O policies, this Court finds, as stated above, that the four JPMorgan D & O polices do afford the Outside Directors' coverage.  Thus, the question that must be resolved is whether the availability of other coverage limits the Outside Directors' right an equal portion of the remaining Proceeds.

The Gulf Policy contains an "Other Insurance" provision that states, "[i]f any Loss otherwise covered under this Policy is insured under any other valid and collectible policy or policies, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other insurance, whether such other insurance is stated to be primary, contributory, excess, [or] contingent . . ."  The four JPMorgan D & O policies all contain similar provisions that make them the excess policies in the event that there are other valid and collectible insurance proceeds available.

When all insurance policies "contain excess 'other insurance' clauses, it is generally held that those clauses will be considered mutually repugnant and will be disregarded.  The loss under those circumstances will also be apportioned *pro rata* between the policies, usually on the basis of stated limits of liability."

Practising Law Institute, <u>Commercial Law and Practice Course</u> <u>Handbook Series</u>, 454 PLI/Comm 503, 507-08 (1988).

Two of the four JPMorgan D & O policies have stated limits of $25,000,000.00. The two others, which do not provide direct coverage to the Outside Directors, provide JPMorgan indemnification coverage. As stipulated, JPMorgan has paid for the defense costs of the Outside Directors. If this Court were to follow the common practice in the insurance industry and prorate the allocation among the policies based on the stated limits of the policies, the Outside Directors would receive less than a tenth of the remaining Proceeds from the Gulf Policy.

This Court, however, will not take this approach because of the unproven facts in this case. First, although JPMorgan has provided defense cost payments to the Outside Directors, it is unclear and unproven if JPMorgan is obligated to do so in the future. Thus, the Outside Directors might not be able to turn to two of the four JPMorgan D & O policies identified and placed into the record. Additionally, although the other two policies provide direct coverage to the Outside Directors, it is unclear if those insurers would actually pay the Outside Directors (or JPMorgan) if called upon to make distributions under those policies. The JPMorgan D & O insurers might very well contest liability. The insurers might also seek some sort of recission of the policies. There are too many unknown facts at this point in order prorate the

allocation between the Gulf Policy and the four JPMorgan D & O policies.

V.    CONCLUSION

Based on the foregoing discussion, the allocation of the Gulf Proceeds will be as follows:

1.    NCFE will receive $1,500,000.00.

2.    The four Founding Directors will receive $500,000 each.

3.    The Outside Directors will also receive $500,000.00 each.

If any of the directors are found guilty in the future of any act that might affect their right to coverage under the Gulf Policy, applicable law might require such director to disgorge their portion of the Proceeds.

IT IS SO ORDERED.

Copies to:

General Service List

# # #